Jesse **FREEMAN** et al., Appellants,

v.

The **GOULD SPECIAL SCHOOL DISTRICT OF LINCOLN COUNTY, ARKANSAS**, et al., Appellees.

No. 19016.

United States Court of Appeals
Eighth Circuit.

Jan. 15, 1969.

Before BLACKMUN, GIBSON and LAY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

Plaintiffs, six Negro school teachers, with the support of the Arkansas Teachers Association, Inc., seek to compel the defendant Gould Special School District to renew their annual teaching contracts and in addition request damages and attorneys' fees against all the defendants.[1]

In May 1967, the individual plaintiffs received notice from the defendant Gould Special School District that their teaching contracts would not be renewed for the 1967–1968 school term for teaching in the district's all-Negro Field School. The notification was in accordance with requirements of Ark.Stat.Ann., § 80–1304 (b), whereby teachers' annual contracts are automatically renewed unless notification in writing is made within a prescribed time to the contrary.

The Board's decision not to renew the teaching contracts was based upon a recommendation of defendant Horace Itty Dalton, the Negro principal of the Field School. Dalton was in charge of employment and re-employment at the Field School. His recommendation that the teaching contracts not be renewed was based generally upon his contention that the teaching plaintiffs were incompetent, failed to co-operate with his administration, did not adhere to the chain of command in processing complaints, and some varied personal objections. His views were stated in an informal memorandum set forth on a typewritten sheet to Superintendent Sage and the Board.[2]

Conrad K. Harper, New York City, for appellants, Jack Greenberg and Michael Meltsner, New York City, and John W. Walker and Norman J. Chachkin, Little Rock, Ark., and George Howard, Pine Bluff, Ark., on the brief.

G. Ross Smith and Robert V. Light, Little Rock, Ark., for appellees, Herschel H. Friday, Little Rock, Ark., on the brief.

1. In addition to the School District, the plaintiffs joined T. Raymond Sage, the superintendent of the District, and Horace Itty Dalton, the Negro principal of the Field School, as defendants.

2. The memorandum in pertinent part reads as follows:
 "Dear Members and Superintendent:
 "Mr. Matlock and myself have worked this program out together all year, and we have come to the conclusion that these people do not meet the requirements of a good school system. I have recommended these people for no contract.
 "Mrs. Inez Nichols: 'bullheaded, goes to Pine Bluff without permission, old trends of teaching, don't adhere change of command'
 "Mrs. Jesse Freeman: 'incompetent, old fashion teaching methods, keep children afraid of her, disregard modern trends of teaching, insubordination'
 * * * * * * *
 "Mrs. Earlene Woods: 'lazy, out of class everytime I visit elementary de-

Mrs. Nichols and Mrs. Freeman had taught 24 years and 35 years respectively in the Gould District; Mrs. Woods 2 years; Mrs. Walker 4 months; and Mrs. Calloway and Mrs. Wilhite 4 years. There is no procedure or machinery set up under Arkansas law for school boards to conduct a hearing on complaints or on the hiring or rehiring of teachers. The Board at the request of the dismissed teachers did, however, hold a hearing on Monday, June 5, 1967, and another hearing in July 1967, giving the dismissed teachers the opportunity to appear and state their side of the dispute with Dalton. The Board, however, refused to rescind its position.

The complaint filed June 8, 1967, alleged that the Board's refusal to rehire the teachers was "solely because of their race or color and the punitive motivation of defendant Dalton." An allegation was also made that "plaintiffs were discharged because of the impending necessity for defendant district to fully desegregate its faculty by assigning Negro teachers to white schools and white teachers to Negro schools."

██ The District Court, the Honorable Oren Harris, Chief Judge of the Western District of Arkansas, held that there was no evidence that the teachers were terminated because of their race or color or because of any civil rights issue. He viewed the evidence as presenting no federal question but as an internal dispute between the teachers and their principal, which dispute should remain in the jurisdiction of the School District and the state courts and not brought into federal court. The complaint was dismissed at the close of plaintiffs' case. The District Court specifically found: (1) that the employment of the individual plaintiffs was terminated by defendants for reasons wholly unrelated to any improper racial consideration; (2) that the defendant School Board acted within the discretion vested in it by law in electing not to employ the individual plaintiffs for the 1967–1968 school year; and (3) concluded as a matter of law "the proof fails to establish that defendants have deprived plaintiffs of any rights, privileges or immunities secured by the Constitution and laws of the United States." While the findings might be more detailed, we believe Judge Harris' findings comply with Rule 52(a), Fed.R.Civ.P. As articulated by Judge Mehaffy in Manning v. Jones, 349 F.2d 992, 996 (8 Cir. 1965):

" * * * [A] district court's findings of fact must be liberally construed and found to be in consonance with the judgment if the judgment has support in the record evidence. * * * This is so even if the findings are not as specific or detailed as might be desired."

██ Plaintiffs assert jurisdiction in the United States District Court under 28 U.S.C. § 1343(3) and (4) [3] and denomi-

partment, incompetent and neglect night activities'

"Mrs. Walker: 'after each payday she stays at home, no co-operation, insubordination, don't believe in change of command'

"Mrs. Essie Calloway: 'lazy, incompetent and non-co-operative'

"Mrs. T. N. Wilhite: 'non-co-operative, don't attend night activities, every year skin sickness, in the wrong field— Home Economics major.'"

(The letter also recommended that the contracts of 15 other teachers be renewed.)

3. Section 1343 in pertinent part reads as follows:

"1343. Civil rights and elective franchise.

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

* * * * * * *

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

nate their suit as an action in equity authorized by 42 U.S.C. § 1981 and § 1983.[4] Plaintiffs assert their rights, privileges and immunities sought to be secured in this action are guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States.

We agree with the District Court that the evidence fails to sustain a cause of action under § 1343(3) as there has been no "deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution" or laws; or under sub-section (4) authorizing relief "for the protection of civil rights, including the right to vote"; or under § 1981, the old civil rights section placing all persons on a par with "white citizens"; or under § 1983, another old civil rights section, referring to deprivation of rights, privileges or immunities under color of any statute, ordinance, regulation, custom or usage.

The plaintiffs' complaint cast as a civil rights action fails to show any deprivation of rights or privileges (immunity is not claimed) under color of any State law, statute, ordinance, regulation or custom. No racial discrimination is shown at all.[5] On appeal the plaintiffs have dropped their initial request for enjoining the defendant School District from employing or assigning teachers on the basis of their race or color and are not pressing their charge that the teaching plaintiffs did not have their contracts renewed because of their race or color. There was no evidence introduced on the first issue, and the finding of the trial court on the latter issue is clearly supported by the evidence. Plaintiffs now contend that the Board acted arbitrarily, capriciously, and unreasonably in its attempt to resolve the conflict between the six teachers and Principal Dalton.

The Board did indicate to the plaintiffs that it would rehire them if they could resolve their differences with Dalton and secure his recommendation for their rehire. The plaintiffs view the Board's position in sustaining Dalton's recommendation for not renewing their contracts and placing upon them the burden of securing Dalton's approval as arbitrary and capricious and a denial of federal due process under the Fourteenth Amendment. Stripped of the racial issue this case presents no federal question.

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

4. Sections 1981 and 1983 (enacted in 1870 and 1871 respectively) read as follows:
"§ 1981. Equal rights under the law.
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."
"§ 1983. Civil action for deprivation of rights.
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

5. All of the teaching plaintiffs testified to the effect that they did not attribute their dismissal to their race or color nor did they have any complaints or evidence concerning the assignment of teachers on the basis of their race or color. All of them denied the charges of incompetency and insubordination. They made counter-charges alleging that Dalton was incompetent, that his motive for singling out the plaintiffs was punitive in nature and resulted from Dalton's lack of administrative ability and competency. They also complained of some personal actions of Dalton. Two of the teachers testified that Dalton made improper advances or proposals to them, which Dalton denied in his deposition and testimony.

Teachers in the Arkansas schools are not covered by any type of civil service or tenure law. By Ark.Stat.Ann. § 80–1304 (b), they shall be employed by written contract annually. Their status is set forth in Shelton v. Tucker, 364 U.S. 479, 482, 486, 81 S.Ct. 247, 249, 251, 5 L.Ed.2d 231 (1960):

> "Teachers there are hired on a year-to-year basis. They are not covered by a civil service system, and they have no job security beyond the end of each school year. The closest approach to tenure is a statutory provision for the automatic renewal of a teacher's contract if he is not notified within ten days after the end of a school year that the contract has not been renewed.
>
> \* \* \* \* \* \*
>
> " \* \* \* [T]he teacher serves at the absolute will of those to whom the disclosure [lists of organizations belonged to within the last five years] must be made—those who any year can terminate the teacher's employment without bringing charges, without notice, with-out a hearing, without affording an opportunity to explain."

The Arkansas Supreme Court also specifically observed in Johnson v. Wert, 225 Ark. 91, 279 S.W.2d 274, 276 (1955): "Ordinarily the board has the absolute right to decline to employ or re-employ any applicant for any reason whatever or for no reason at all." This holding is in line with the general law on the employment or re-employment of school teachers.

> " \* \* \* [T]eachers are normally subject to selection at the hands of school boards, since among the general powers usually reposed in such boards is included the power to enter into contracts with teachers and to fix their compensation and terms of employment. The discretion of a school board in this respect is very broad, and when such discretion is exercised in good faith and is not contrary to law, the courts will not interfere to aid one whom the board does not choose to employ. The refusal of the board to em-

ploy one as a teacher is in no sense an infringement of any constitutional right of that person. The board has the absolute right to decline to employ or to re-employ any applicant for any reason whatever or for no reason at all." 47 Am.Jur., Schools § 114 (1943).

While the school boards in Arkansas have the right to decide whom they are going to employ or re-employ, the basis for failing to re-employ must not be on impermissible constitutional grounds. Smith v. Board of Education of Morrilton School District No. 32, 365 F.2d 770 (8 Cir. 1966) (racial discrimination); Johnson v. Branch, 364 F.2d 177 (4 Cir. 1966), cert denied 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (racial discrimination); Shelton v. Tucker, supra, (a disclosure statute violative of the right of associational freedom, closely allied to freedom of speech).

█ In Arkansas the board's right not to rehire a teacher in the school district appears to be absolute, except that the decision must not rest on grounds that are violative of constitutional or legal rights. The plaintiffs in the District Court, after presenting all of their evidence, argued that as a matter of federal due process they had a right to have their contracts renewed and to receive damages for the failure to renew. They predicated their claim on Slochower v. Board of Higher Education of New York City, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) and Schware v. Board of Bar Examiners of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). In *Slochower* the Court in a 5-to-4 decision held unconstitutional a New York City charter provision that provided for automatic dismissal from public employment of one asserting a Fifth Amendment privilege against self-incrimination before any court or public hearing or inquiry. The Court viewed the charter section as violative of the Due Process Clause of the Fourteenth Amendment for the asserted reason that the mere claim of the privilege does not provide a reasonable basis for the termination of employment. 555 of 350 U.S., 76 S.Ct. 637.

Under the New York education law, teachers have tenure and can only be discharged for cause after notice, hearing, and appeal. We do not think *Slochower* is applicable as it applied to a tenure situation and an unconstitutional city charter provision.

In *Schware*, the Court in a unanimous decision, with Justice Whittaker abstaining held a person otherwise qualified could not be denied the opportunity to take the New Mexico state bar examination on a discriminatory basis of qualification. The Court held 353 U.S. at 238–239, 77 S.Ct. at 756:

"A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment."

and further held at 239, 77 S.Ct. at 756: "[A]ny qualification must have a rational connection with the applicant's fitness or capacity to practice law." We do not deem *Schware* as applicable as that case dealt with the general right to practice a profession and did not deal with the narrower question of a right to specific employment.

■■■ Almost all of the cases cited in support of plaintiffs' position are concerned with either racial discrimination or an invasion of a constitutionally protected right or privilege by way of a statute or regulation. We agree that the teachers are protected under the Equal Protection Clause from discrimination on account of race or religion or in their assertion of constitutionally protected rights, but no case cited by plaintiffs has gone so far as to say that all actions of any governmental board or agency in employment cases must accord the individual due process under the Fourteenth Amendment so as to provide tenure and a right to retain the position, except for cause. And "for cause" presupposes a right to hearing, notice, and appeal. Many government employees are under civil service and some under tenure. Absent these security provisions a public

employee has no right to continued public employment, except insofar as he may not be dismissed or failed to be rehired for impermissible constitutional reasons, such as race, religion, or the assertion of rights guaranteed by law or the Constitution.

Without detailing all of the cases cited, a review of the principal cases relied on is illuminating. In Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952), the Court struck down a so-called loyalty oath holding the "* * * constitutional protection does extend to the public servant whose exclusion *pursuant to a statute* is patently arbitrary or discriminatory." (Emphasis supplied). Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) dealt with security clearance procedures not authorized by the President or by the Congress; Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), a denaturalization proceeding; Spriggs v. Altheimer, Arkansas School District No. 22, 385 F.2d 254 (8 Cir. 1967), civil rights case concerned with a discriminatory practice in charging tuition; Cramp v. Board of Public Instruction of Orange County, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961), Florida statutory loyalty oath; Franklin v. County School Board of Giles County, 360 F.2d 325 (4 Cir. 1966), discriminatory racial discharge; Torcaso v. Watkins, Clerk, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), Maryland religious oath violative of First Amendment; Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), Washington statutory loyalty oath.

Plaintiffs rely on Safferstone v. Tucker, 235 Ark. 70, 357 S.W.2d 3 (1962) for their assertion that the Board must meet due process requirements in all of its actions. That case held a school board had not abused its discretion in transfering students from a white elementary school and converting that school into a Negro school. This again is a case dealing with racial discrimination and the related problems of desegregation. The Court there, after recognizing the broad discre-

tion vested in the school board, said at 4: "* * * the matter addresses itself to the question as to whether or not the action taken in this case was arbitrary, unreasonable, capricious, wrongful, discriminatory or oppressive." On the basis of this holding, plaintiffs then project that the Board must accord due process, both substantive and procedural, in all of its operative procedures. If this were so, we would have little need of tenure or merit laws as there could only be, as argued by the plaintiffs, a discharge for cause, with the school board carrying the burden of showing that the discharge was for a permissible reason. We do not believe this to be the law, as there are many public employees who are separated from their employment by a purely arbitrary decision, upon a change of administration or even a change of factual control where the appointments are not protected by civil service or some type of tenure, statutory or contractual.

Plaintiffs also assert they were denied procedural due process in that they were afforded no opportunity to confront and cross-examine Principal Dalton. They cite Willner v. Committee on Character, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963), which held that a person who had passed a state bar examination had a right to a hearing when his character was put in issue by the adverse report of a bar committee. In discussing the matter the Court stated at 103, 83 S.Ct. at 1180: "* * * [T]hat procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood." This case again relates to the right of a person otherwise qualified to be licensed in a profession and does not present the same

type of situation as the case at bar, which is a right to specific employment.

When a particular statutory procedure is set up for the dismissal of a teacher it must be followed, but absent statutory procedures the Board may adopt its own method. 47 Am.Jur., Schools § 125 (1943). Although not legally required to do so,[6] the Board did accord the teachers a hearing to air their grievances,—one hearing before this suit was filed and the other one shortly after. Plaintiffs also took Dalton's deposition. This, of course, would not be dispositive of their right of confrontation at the first Board hearing if it were incumbent upon the Board to produce Dalton. Actually, the plaintiffs never requested an opportunity to confront and cross-examine Principal Dalton at a Board hearing. However, we do not think the Board was obligated under these circumstances to produce Dalton at a hearing. Principal Dalton's function in the hierarchy of the school administration was to make recommendations for the employment and re-employment of the teachers. He was serving as an arm of the Board in this respect and, of course, was available for conferences with the Board. From the evidence, it appears the Board acted in good faith, and members of the Board also made their own investigation of the controversy.

The cases cited by plaintiffs deal with procedural due process in criminal proceedings and in proceedings concerned with technically qualified applicants for licensure in a profession where character is also a vital issue. These cases are not germane to the precise issue here of whether the Due Process

6. Under Arkansas law the teachers are not entitled to a hearing as a matter of right. The Attorney General of Arkansas in an opinion dated May 10, 1967 construed the Arkansas law as follows:
"Ark.Stat.Ann., § 80–1304 provides for the renewal of teacher's contracts in writing by the directors of the school district. No reason need be given for the termination of a teacher's contract as this is left to the discretion of the board.

"No statutory authority is found for the granting of a hearing on the matter and consequently a hearing, if granted by the board, may be conducted in whatever manner the board determines most desirable. The teacher may be represented by an attorney at the hearing if the board so desires, but no authority is found for such representation."

Clause of the Fourteenth Amendment requires an administrative hearing on the refusal to reemploy a teacher, with subsequent judicial review on a claim of arbitrariness. See, Studemeyer v. Macy, 116 U.S.App.D.C. 120, 321 F.2d 386 (1963), cert. denied 375 U.S. 934, 84 S.Ct. 337, 11 L.Ed.2d 265. Absent statutory or contractual requirements, persons discharged for inefficiency, incompetency, or insubordination have no constitutional right to a hearing with rights of cross-examination and confrontation of witnesses.

 We do not think it within the province of the federal court to pass upon and decide the merits of all of the internal operative decisions of a school district. However, even if we were to pass upon the merits of this issue, we do not think that we could say that the Board was capricious or arbitrary in its attempt to resolve this internal dispute between the teachers and the principal of the school. There must be some degree of harmonious cooperation in school administration to insure an efficient use of public funds and a reasonably satisfactory school program. School boards are representatives of the people, and should have wide latitude and discretion in the operation of the school district, including employment and rehiring practices. Local autonomy must be maintained to allow continued democratic control of education as a primary state function, subject only to clearly enunciated legal and constitutional restrictions.

We, therefore, conclude with the District Judge that there is no civil rights issue presented in this case and that the disagreement between the plaintiff teachers and the principal is an internal matter to be handled by the School Board. Further, there is no federal due process issue presented.

Judgment affirmed.

LAY, Circuit Judge (dissenting):

Six school teachers [1] seek damages under the Civil Rights Act against officials of the Gould School District for alleged deprivation of constitutional rights. Their claims arise out of the school board's nonrenewal of their teaching contracts for the 1967–68 school term. The plaintiffs claim that the school officials have arbitrarily excluded them in that there exists no evidentiary support for their rejection because of alleged professional incompetency. The sole issue is whether, under these circumstances, the district court was correct in holding that the plaintiffs have failed to state a claim cognizable under the Civil Rights Act, Title 42 U.S.C. § 1983. The majority affirms the ruling below. I respectfully dissent.

The record demonstrates that the board has adopted the charges of overall incompetence brought by the principal, Horace Itty Dalton, in his official notification of release given to the teachers in May 1967.[2] Plaintiffs allege that Dalton's purge was based upon personal con-

---

1. Mrs. Nichols had taught 24 years in the elementary department in Field School with a B.S. degree in elementary education; Mrs. Freeman had taught 36 years in the elementary department in Field School with a B.S. degree in elementary education; Mrs. Woods had taught two years in the elementary department and holds a B.S. degree in elementary education; Mrs. Walker had taught only since February 1967, and has a B.S. degree in home economics; Mrs. Calloway had taught four years and has a B.S. degree in home economics; and Mrs. Wilhite had taught four years in the high school and has a B.S. degree in home economics.

2. Mr. Sage, the Superintendent of Schools, testified in his deposition:
 *P. 189 of Record*
 "Q. Is the reason or the basis for the termination given by Mr. Dalton that she was incompetent, is that the reason you failed to recommend that she be rehired?
 "A. That's right. On Mr. Dalton's recommendation.
 "Q. But it was based on her incompetence?
 "A. That's right."
 *P. 191 of Record*
 "Q. Did you investigate the charges that he [Dalton] made to determine

siderations completely unrelated to their professional competency.[3] The evidence is unequivocal that Dalton's charges of the teachers' incompetency are based upon conclusory, contradictory and incredible statements.[4] Plaintiffs' evi-

whether or not there was any substance to them? Did you personally investigate each case?

"A. No. There was no way for me to investigate. If he [Dalton] says the teacher is incompetent, why we put him in there to run that school and hold him responsible for it and if we do, why then we think he should have the right to have recommendations on the teachers.

"Q. Did the board investigate the substance?

"A. No."

3. Each of the teachers charged denied that she had ever done anything wrong and specifically rebutted the truthfulness of any of Dalton's specific charges. Mr. Sage testified that he did not have any reason to believe any of the teachers charged were not truthful in their testimony. He had never received any complaints from persons about the performance of the teachers charged. Each of the teachers had a college degree and generally had teaching experience. See, n. 1, supra.

Plaintiff teachers allege that Dalton's dislike for them arises from various situations unrelated to their teaching positions, each of which involved one or more of them: one teacher had testified against him on a criminal charge arising out of a situation where Dalton was arrested when he brandished a gun; the alleged association of two of them with the Student Non-Violent Coordinating Committee in Gould; the assertion by Dalton that the NAACP "bunch" was opposed to him as a principal; rebuffs by two of the teachers of alleged improper advances ("propositioning") made by Dalton; the failure of one teacher to conduct adult classes which were separately funded and distinct from her regular school duties; a spat between two teachers over a car pool arrangement which resulted in Dalton placing a "question mark" behind one of their names; the accusation that one of the teachers was being uncooperative with Dalton by refusing to accept bus duty whereas she was teaching under a special program and had been excused from bus duty by the superintendent; and the accusations of "insubordination" for going over Dalton's head whereas the superintendent encouraged the teachers to bring their problems directly to him.

4. For example, Mr. Dalton, the principal, was questioned concerning the competency of the various teachers:

*P. 37 of Record*

"Q. Mr. Dalton, * * * What are the standards that you use for determining whether or not a person is competent?

"A. I don't know what her [Mrs. Dalton's]* standards are.

"Q. All right, then, let's go back to yours. What are your standards?

"A. Same as hers, I guess."

* Mrs. Dalton was the head teacher at the Field Elementary School.

*P. 83 of Record*

"Q. Does she [Mrs. Nichols] do a good job in the classroom?

"A. She's a pretty good teacher.

"Q. So she is competent as a teacher?

"A. No, no. I'm not saying that."

*P. 84 of Record*

"Q. So you're saying that she is not competent, but that she is a good teacher. How do you explain that, Mr. Dalton?

"A. I tell you what. The best way that could be answered is let my wife answer that question.

"Q. All right, sir. You can't explain it?

"A. No, I can't explain it."

Mr Dalton was questioned:

*P. 105 of Record*

"Q. Is she [Mrs. Wilhite, one of the teachers not rehired] nosy? Is she nosy?

"A. Sure not nosy, but she's worse than nosy.

"Q. Worse than nosy. How is she worse than nosy?

"A. No.

"Q. You don't know?

"A. No."

Again the testimony of Mr. Dalton:

*P. 68–69 of Record*

"Q. Have you been in the classroom long enough to observe that?

"A. I don't need to be in there.

"Q. How do you know they didn't do it?

"A. I get reports. I don't have time to sit in a classroom.

"Q. Are those reports written?

"A. No, they wasn't written.

"Q. We have no way of looking at those reports, do we?

"A. You can only take my word for it."

dence clearly establishes that these charges of incompetency have no basis in fact.

The majority opinion assumes that the protective cloak of the due process clause as enunciated in Slochower v. Board of Higher Educ., 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956), does not apply to a public school teacher who is without tenure under Arkansas law. I disagree. Constitutional rights of public school teachers are not conditioned upon state tenure laws. The entire discussion of "tenure" is irrelevant to the facts here. *Slochower* does not turn upon recognition of tenure laws but upon the denial of the " 'protection of the individual against arbitrary action' " which violates due process of law. Id. at 559, 76 S.Ct. at 641. The existence of the New York tenure laws in *Slochower* was incidental to the decision. To reason otherwise is to disregard the teachings of Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).[5] The Supreme Court there recognized that a renewal of a teacher's contract, notwithstanding lack of tenure under Arkansas law, cannot be refused on arbitrary or capricious grounds. Involved in *Shelton* was the denial of a constitutional privilege, namely, freedom of association. However, the significance of the *Shelton* holding is that this denial constituted such arbitrary and unreasonable grounds for refusal to renew a teacher's contract that it was deemed violative of the due process clause of the Fourteenth Amendment.

The majority narrowly interpret *Shelton* and its progenitors to say that the only time an individual can claim protection of due process from arbitrary governmental exclusion is when there has been a denial of an independent and separate constitutional right, such as freedom of association, or racial discrimination. None of these cases is so restricted. Overlooked are the principles of Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) and Konigsberg v. State Bar, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957).

In *Schware*, supra, a prospective lawyer had been barred from becoming a licensed member of a state bar and the Supreme Court in granting him relief observed:

> "A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. * * * Even in applying permissible standards, *officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards * * *.*" (My emphasis.)

353 U.S. at 238–239, 77 S.Ct. at 756.[6] And see United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 106, 47 S.Ct. 302, 304, 71 L.Ed. 560 (1927):

> "Deportation without a fair hearing or on charges unsupported by *any* evidence is a denial of due process * * *." (My emphasis.)

The majority stresses that aside from racial discrimination, arbitrary exclusion depends upon a regulation or statute. I

---

5. Compare Bomar v. Keyes, 162 F.2d 136 (2 Cir. 1947), where a "probationary teacher" in New York, without tenure, was found to have stated a claim for relief under the Civil Rights Act arising out of her dismissal for absenteeism due to federal jury service.

6. In Konigsberg v. State Bar, 353 U.S. 252, 262, 77 S.Ct. 722, 728 (1957), the Supreme Court said:

 "Konigsberg claims that he established his good moral character by overwhelming evidence and carried the burden of proving that he does not advocate overthrow of the Government. *He contends* here, as he did in the California court, *that there is no evidence in the record which rationally supports a finding of doubt about his character or loyalty.* If this contention is correct, he has been denied the right to practice law although there was no basis for the finding that he failed to meet the qualifications which the State demands of a person seeking to become a lawyer. *If this is true, California's refusal to admit him is a denial of due process and of equal protection of the laws because both arbitrary and discriminatory.*" (My emphasis.)

submit the Fourteenth Amendment covers more than legislative action of the state. It "governs *any* action of a State, 'whether through its legislature, through its courts, or through its executive or administrative officers.'" (My emphasis.) Mooney v. Holohan, 294 U.S. 103, 113, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935). This principle is so entrenched in constitutional law that citation of authority should not be necessary. Cf., Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). As stated in Hurtado v. California, 110 U.S. 516, 531–532, 4 S.Ct. 111, 119, 28 L.Ed. 232 (1884):

> "In this country written constitutions were deemed essential to protect the rights and liberties of the people against the encroachments of power delegated to their governments, and the provisions of Magna Charta were incorporated into Bills of Rights. They were limitations *upon all the powers of government*, legislative as well as executive and judicial." (My emphasis.)

The majority finally urges that *Schware* is distinguishable because "that case dealt with the general right to practice a profession and did not deal with the narrower question of a right to specific employment." This same argument was urged in Wieman v. Updegraff, 344 U.S. 183, 191–192, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952), and there answered by the Supreme Court:

> "We are referred to our statement in *Adler* [Adler v. Board of Educ., 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517] that persons seeking employment in the New York public schools have 'no right to work for the State in the school system on their own terms. United Public Workers v. Mitchell * * *. They may work for the school system upon the reasonable terms laid down by the proper authorities of New York.' 342 U.S., at 492, [72 S.Ct., at 384]. To draw from this language the facile generalization that there is no constitutionally protected right to public employment is to obscure the issue. * * * We need not pause to consider whether an abstract right to public em-

ployment exists. *It is sufficient to say that constitutional protection does extend to the public servant whose exclusion * * * is patently arbitrary or discriminatory.*" (My emphasis.)

I think it clear that although an individual teacher has no constitutional right to be hired for a particular position, nevertheless, a school board's selection process in a renewal of a teacher's contract cannot be upon an arbitrary or capricious basis. The pursuit of a chosen employment has been recognized as a right which is "of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915). Cf., United States v. Lovett, 328 U.S. 303, 314, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). The "right to teach" is a recognized "liberty." Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Cf., Bomar v. Keyes, 162 F.2d 136 (2 Cir. 1947) (an "interest" may be "an expectancy of continued employment"). See also Note, 81 Harv.L.Rev. 1045, 1080 (1968). This principle has been made viable in many cases relating to government employees, including teachers, lawyers and other vocations wherein an arm of government arbitrarily seeks to deprive a citizen from his rightful pursuit of employment. In Allgeyer v. Louisiana, 165 U.S. 578, 589–590, 17 S.Ct. 427, 431, 41 L.Ed. 832 (1897), the Court said:

> "It was said by Mr. Justice Bradley in Butchers' Union Company v. Crescent City Company, 111 U.S. 746, 762, [4 U.S.Ct. 652, 657, 28 L.Ed. 585] in the course of his concurring opinion in that case, that 'The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase "pursuit of happiness" in the Declaration of Independence, which commenced with the fundamental proposition that "all men are created equal, that they are endowed by their Creator with certain in-

alienable rights; that among these are life, liberty and the pursuit of happiness." This right is a large ingredient in the civil liberty of the citizen.' Again, on page 764, [4 S.Ct. 652] the learned justice said: 'I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States.' And again, on page 765, [4 S.Ct. 652]: 'But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers; which, as already intimated, is a material part of the liberty of the citizen.' It is true that these remarks were made in regard to questions of monopoly, but they well describe the rights which are covered by the word 'liberty' as contained in the Fourteenth Amendment."

In Birnbaum v. Trussel, 371 F.2d 672 (2 Cir. 1966), the Second Circuit reviewed a suit brought under the Civil Rights Act by a physician who was dismissed from a municipal hospital in Brooklyn, New York, without notice of charges. Other city hospitals were notified not to put Dr. Birnbaum on their staffs. He was later told his discharge was because of his "anti-Negro" bias which had been complained of by union employees working at the hospital. The district court denied plaintiff's complaint for failure to state a ground for relief. The court of appeals sustained the lower court's ruling that plaintiff did not allege facts sufficient to establish a deprivation of equal protection of laws under 42 U.S.C. § 1985(3), but held a claim was

stated for a conspiracy to violate 42 U.S.C. § 1983. The court, after reviewing the existing cases, noted:

"The principle to be extracted from these cases is that, *whenever there is a substantial interest*, other than employment by the state, involved in the discharge of a public employee, he can be removed neither on arbitrary grounds nor without a procedure calculated to determine whether legitimate grounds do exist." (My emphasis.) 371 F.2d at 678.

The court then stated that it considers "the ability to pursue a profession effectively" to be a substantial interest and noted that this interest has received "meticulous protection * * * to prevent direct injury by arbitrary state action." 371 F.2d at 678–679 n. 13. Immediate temptation exists to distinguish the denial of the license to practice law or the discharge of the city doctor from the status of the "non-tenure" teacher whose contract is not renewed. However, analysis makes such distinction superficial. *In each situation, the right to the specified job is not in issue; rather, the focal stake is the personal liberty to pursue one's employment without arbitrary vilification and reckless exclusion by the state.*

The result here also overlooks the full implications of Greene v. McElroy,[7] 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) and Cafeteria & Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743 (1961). In *Cafeteria Workers*, relief was denied a cook who lost her job for failure to meet security regulations of a Naval Gun Factory. The majority opinion emphasizes that the exclusion did not in any way impair the employee's employment opportunities elsewhere [8] because the plaintiff there

7. Although the Court in Cafeteria & Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), limits Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400 (1959), to a nonconstitutional basis, the Court has acknowledged that *Greene* had constitu-

tional implications. See United States v. Robel, 389 U.S. 258, 263, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

8. Justice Brennan dissents, joined by Chief Justice Warren, Justices Black and Douglas. Mr. Justice Brennan there said:

had been offered other employment that did not require compliance with security regulations.

The instant facts fall within the statement of the Supreme Court in Cafeteria Workers, 367 U.S. at 897–898, 81 S.Ct. at 1750:

"[T]he state and federal governments, even in the exercise of their internal operations, do not constitutionally have the complete freedom of action enjoyed by a private employer. But to acknowledge that there exist constitutional restraints upon state and federal governments in dealing with their employees is not to say that all such employees have a constitutional right to notice and a hearing before they can be removed. We may assume that Rachel Brawner could not constitutionally have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory—that she could not have been kept out because she was a Democrat or a Methodist. It does not follow, however, that she was entitled to notice and a hearing when the reason advanced for her exclusion was, as here, entirely rational and in accord with the contract with M & M.

*"Finally, it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity."* (My emphasis.)

Has a "badge of infamy" been bestowed upon these teachers by Dalton's reckless charges? To assume the negative is to obscure realistic appraisal of the plaintiffs' opportunities for future employment in their profession. The present charges of incompetency will have serious and detrimental effects on their entire teaching careers. Their respective liberty to pursue their professions within their community and state has been seriously impaired if not totally abrogated.

A teacher's ability to earn a living by pursuing his profession is fundamentally different from other professions such as law or medicine. The teacher's opportunities are narrowly confined. As has been observed, "admission to the profession comes through licensing, but admission to practice is dependent upon some public employer of teachers, a school district, admitting the licensed teacher to practice." Campbell, Cunningham & McPhee, The Organization and Control of American Schools, 259 (1965). The old adage that "bad news travels fast" is devastatingly accurate in weighing a teacher's opportunities for employment when released upon charges of incompetency. The selection of competent teachers is still competitive in Arkansas. Cf. Walton v. Nashville, Ark., Special School Dist., 401 F.2d 137 (8 Cir. 1968).

In comparing selection of teachers with the process of release, it has been said:

"Moreover, appointment is done privately, it has no public repercussions for the rejected candidates. It carries no implication concerning the unfitness of the latter, *whereas dismissal has very serious consequences for the reputation and the future of the person who is subjected to it."* (My emphasis.) MacIver, Academic Freedom in Our Time 171 (1955).

It is difficult to imagine how plaintiffs' abilities to pursue the teaching profession could have been more thoroughly circumscribed than they were here. Indeed, as in Birnbaum v. Trussel, supra, the issue here is the right to pursue a profession effectively. See also, Schware v. Board of Bar Examiners, supra; Konigsberg v. State Bar, supra; Slochower v. Board of Higher Educ., supra; Wieman v. Updegraff, supra; Douglas v. Noble, 261 U.S. 165, 43 S.Ct. 303, 67 L.Ed. 590 (1923); Crane v. Johnson, 242 U.S. 339, 37 S.Ct. 176, 61 L.Ed. 348

"Such a result in effect nullifies the substantive right—not to be arbitrarily injured by Government—which the Court purports to recognize. * * *" 367 U.S. at 900, 81 S.Ct. at 1751.

(1917); Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889); Parker v. Lester, 227 F.2d 708 (9 Cir. 1955); Johnson v. Branch, 364 F.2d 177 (4 Cir. 1966).

Recognition of plaintiffs' claims does not mean that a school board cannot exercise its discretion to reject a teacher for incompetence. To grant plaintiffs relief does not in any way raise non-tenure positions to tenure status. Nor does it mean that federal courts or the Civil Rights Act will become a haven for every disenchanted school teacher whose teaching contract is not renewed. As stated by the Supreme Court:

> "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. * * * By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. On the other hand, 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools,' Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251 (1960) * * *."

Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270 (1968).

When the board's discretion is challenged, the burden of proof always remains on the plaintiff to demonstrate impermissible grounds. This burden was satisfied here. A proper holding here would relate only to that area of judicial review which traditionally protects individuals from arbitrary and capricious actions of a state. When governmental arbitrary action occurs under color of state law, and an individual has been deprived of federal rights as a result thereof he should appropriately be able to seek redress in the federal courts under the civil rights statutes. It seems to me this is what this case is all about. As long as a public school board chooses to set forth reasons for a teacher's exclusion and the stated grounds are damaging to professional qualification, I submit the Constitution affords the protection of substantive due process.[9]

I would reverse and remand with directions for the trial court to find for each of the plaintiffs and to receive evidence as to appropriate damages to be awarded. Cf. Smith v. Board of Educ. of Morrilton School Dist., 365 F.2d 770 (8 Cir. 1966).

---

9. I find it unnecessary to discuss procedural due process. The essence of plaintiffs' claim here is that their exclusion was arbitrarily made without basis in fact. Even had plaintiffs been given several hearings, if there exists no evidentiary support to the charges of incompetency, a claim for relief is properly stated under 42 U.S.C. § 1983. Mr. Justice Harlan said in Poe v. Ullman, 367 U.S. 497, 541, 81 S.Ct. 1752, 1775, 6 L.Ed.2d 989 (1961) (dissenting opinion):

"Were due process merely a procedural safeguard it would fail to reach those situations where the deprivation of life, liberty or property was accomplished by legislation which by operating in the future could, given even the fairest possible procedure in application to individuals, nevertheless destroy the enjoyment of all three. * * *"