331 F.Supp. 193 (1971)
Ruby LONG and Jane Hanneken, Plaintiffs,
v.
BOARD OF EDUCATION OF the CITY OF ST. LOUIS et al., Defendants.
No. 69 C 443(2).
United States District Court, E. D. Missouri, E. D.
June 25, 1971.
Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, Mo., for plaintiffs.
Leo Lyng and Russell N. MacLeod, St. Louis, Mo., for all defendants.

MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
This is a civil rights action by two teachers, each of whom alleges she was refused reemployment for a constitutionally impermissible reason. Defendants are the Board of Education of the City of St. Louis, the individual members of the Board, the Superintendent of Schools, and the Director of Special Education. We have jurisdiction under Section 1343 (3) and (4), 28 U.S.C. and Section 1983, 42 U.S.C.
Plaintiff Ruby Long was employed by the Board of Education for the school year 1967-1968 as Project Director of its Gardenville Diagnostic and Adjustment Center, which was federally funded under *194 Title III, ESEA. Before being offered this position, she had unsuccessfully sought appointment to the position of Director of Special Education, a post which was subsequently given to defendant Walter Kopp. Plaintiff Jane Hanneken was hired as a staff member of the Center for the year 1967-1968, working under the immediate supervision of Dr. Long. The two plaintiffs had known each other for some time prior thereto. Supervisory control of the Center was vested in Mr. Kopp as Director of Special Education, although for a time Dr. Gerald Moeller, in charge of federally funded projects for the Board, assisted Mr. Kopp in order to familiarize him with the operation. Complete over-all supervision of the school system is vested in the Superintendent of Schools under the control of the Board.
Both plaintiffs were reemployed for the school year 1968-1969, completed their work for that year and were fully paid. However, by letter dated April 7, 1969, the Superintendent of Schools, defendant Dr. William Kottmeyer, notified each of them that she would not be reemployed. Under Missouri law, a teacher's first three years of employment are deemed a period of probation. During this period of probation, the appointment of the teacher expires at the end of each school year. However, unless the probationary teacher is notified on or before April 15, that his services will be terminated, the teacher is deemed to have been reappointed for the next school year. Section 168.221 R.S.Mo., V.A.M.S.
The parties are in basic agreement as to the applicable law. School authorities have the right in their sole discretion to decide whether to employ or reemploy a probationary teacher for the next school year except only that the failure to reemploy must not be based on constitutionally impermissible grounds. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811; Williams v. School District of Springfield R-12, Mo., 447 S.W.2d 256; Freeman v. Gould Special School District of Lincoln County, 8 Cir., 405 F.2d 1153, 1158.
Plaintiff's position, disputed by defendants, is that Mrs. Hanneken was denied reemployment because she exercised her protected First Amendment right of free speech and petition by writing a letter to State Representative James Godfrey, and that the decision of defendants not to reemploy Dr. Long was the direct result of her refusal to discharge Mrs. Hanneken for having exercised her constitutional right to write the letter. These are questions of fact which we have resolved in favor of defendants.
Some background facts are helpful in placing the matters in context. The Superintendent of Schools having been notified by the Missouri State Department of Education that federal funds would be available to school districts in Missouri for summer programs under Title VI ESEA, Dr. Long was requested by Mr. Kopp to prepare a project for submission to the state authorities. In turn, Mrs. Hanneken was directed by Dr. Long to prepare the project. When she submitted a rough draft of the proposed project to Mr. Kopp in the total sum of $35,000, he "red-lined" some of the items therein so that the total amount to be sought for that particular project would be $25,000. Nevertheless, when the project was put in final form by Mrs. Hanneken and submitted to the State Department of Education, she left in, with the acquiescence of Dr. Long, those items which Mr. Kopp had directed to be removed. Mr. Kopp was not informed of this action. Thereafter, the State Department of Education, after consultation with Mr. Kopp, eliminated the items to which Mr. Kopp had objected, and approved the project for $25,000. Mrs. Hanneken was in charge of this project that summer, and it was very satisfactorily conducted. However, the evaluation of the program which was due September 1, 1968, was submitted quite late to the State Department.
For the following year, the Superintendent of the St. Louis School District *195 was again notified that federal funds would be available under Title VI for the 1969-1970 year, and again Mr. Kopp directed Dr. Long to prepare a project for submission to the State Department. The total funds available were limited and were allocated to various school districts throughout the State upon approval of their submitted projects in the order in which such projects were submitted to the Department. The St. Louis program, written by Mrs. Hanneken in the amount of $55,000 was submitted late, with the result that ultimately this program was not funded at all. The evidence warrants the belief of Mr. Kopp that plaintiffs (and in particular Mrs. Hanneken) were in large part responsible for the late filing. Additionally, although directed by Mr. Kopp to furnish him with a copy of the program when it was completed, Mrs. Hanneken ignored the request, even though (upon her representation that time would not permit her doing so before filing the program with the State) he asked that a copy be made available to him after the program was filed. On March 22, 1969, several days after the St. Louis proposal was filed by Mrs. Hanneken, a representative of the State Board (Gerald Stewart) had a discussion in St. Louis with Mrs. Hanneken, during the course of which Mr. Stewart inquired as to whether the St. Louis project could function on a grant of $30,000, the maximum amount of funds which might be available. The letter to Representative Godfrey was written the following day.
We believe it apparent from the evidence that neither Dr. Long nor Mrs. Hanneken could adjust to the fact that Mr. Kopp, as Director of Special Education, was their superior and that they were responsible to him. Plaintiffs simply would not accept his authority over them. As for Mrs. Hanneken, her attitude was that she was answerable solely to Dr. Long and that she could if she chose, and she did so choose, ignore specific directions from Kopp. Dr. Long's position was much the same. She believed, whether rightly or wrongly, that she was much more knowledgeable than Mr. Kopp in her field, so that she was justified in cavalierly ignoring his directives. The picture which emerges is that of two strongwilled women dedicated to the interests of the handicapped children under their charge who persisted in acting independently of the wishes and policies of their superior. Their conduct followed a pattern of either failing to follow explicit directions given by Mr. Kopp or of dragging their feet in order to avoid timely consultation with him.
In the evaluation of Dr. Long which Mr. Kopp made at the end of the first year of her service, note was taken of the need for improvement by her in certain areas, particularly in complying with the school system's rules, regulations and policies, in keeping staff members informed of the school board's rules, regulations and policies, and in making required reports promptly and accurately. In the "unsatisfactory" rating which Mr. Kopp made of Dr. Long in 1969, he pointed out that despite repeated warnings to her the situation had not improved and that she was being marked "unsatisfactory for insubordination." This conclusion was based on the good faith determination of Mr. Kopp that Dr. Long "has continued to refuse and accept and follow the administration's decisions and policies made by the Office of Special Education to which she was directly responsible." Based on this "unsatisfactory" rating, Mr. Kopp recommended to the Superintendent of Schools, Dr. Kottmeyer, that Dr. Long, although competent otherwise, not be reemployed.
As for Mrs. Hanneken, her "satisfactory" 1968 evaluation was made by Dr. Long and was accepted by Mr. Kopp who had no personal contact with her. However, Mrs. Hanneken's attitude and conduct in connection with the manner of preparing and submitting the two summer proposals convinced Mr. Kopp that although she was a competent teacher it would be undesirable to reemploy her.
*196 That the letter written by Mrs. Hanneken to State Representative Godfrey[1] had a bearing upon Mr. Kopp's action is not disputed. However, the decision not to reemploy her was not based upon its contents per se but rather upon what the letter disclosed. In the first place, she wrote the letter on official school board stationery and signed it in her official capacity as "Supervisor of Physical Education and/or Motor-Perceptual Skills," so that it could reasonably be concluded that Mrs. Hanneken was undertaking to speak on behalf of the Board as its representative without consulting its policy makers and in complete disdain of the views and opinions of her superiors. Thereby she evidenced her intent and purpose of usurping authority that did not belong to her, or at least defendants could reasonably so conclude. Although Mrs. Hanneken claims that the letter was written by her as a private citizen, we have no doubt that its purpose was to influence the State Board of Education and that she believed that she could best do so by professing to speak as the local Board's representative.
The choice of language she employed clearly indicates that Mrs. Hanneken was professing to represent the official position of the St. Louis School Board and was requesting aid and information on its behalf. There can be no question but that she knew that such a letter would be meaningless unless Mr. Godfrey presented it to the State Board of Education as the views of the St. Louis School Board, and Mr. Donald Cox (the State Board's Director of Special Education) and Mr. Warren Black (Assistant Commissioner of Education) so interpreted it at the time. The letter was directly concerned with a School Board program, rather than with one of Mrs. Hanneken personally. She began by reciting the history of the Title VI program the preceding year for "our" children, which "I" directed. This is a deliberate choice of language differentiating between her personal involvement and the Board program. Continuing, the letter demonstrates that it was "the Board of Education" (not Mrs. Hanneken) which was informed of the availability of the federal funds, as the result of which "a proposal for a summer program * * * in the sum of $35,000.00 was submitted to the Missouri State Department of Education Special Education." Wholly ignoring the fact that it was Mr. Kopp who had insisted that the amount of the proposal be limited to $25,000, and that Mrs. Hanneken, with Dr. Long's approval, had violated Mr. Kopp's directive, the letter places the responsibility solely on the state officials to the proposal for the reduction in the amount allocated and impliedly criticizes the State Board of Education therefor by the statement that "taking into consideration that our proposal was presented late we took the monies issued but begged, borrowed and cut corners to make up the $10,000.00 difference and not affect the program." Again, Mrs. Hanneken was professing to speak the views of the St. Louis Board.
Time after time in the letter the words "we" and "our" are used. As indicated it was "our" proposal that was presented late and it was "we" who took the monies issued but nevertheless "we" had a very effective program. It was "our" program which Mr. Stewart of the State Department of Education observed and in respect to which he asked if "we would be interested in repeating the program in 1969." And when the evaluation of the entire summer program printed and bound by the St. Louis Board was submitted, "we received nothing but favorable comments." Then, with respect to the submission of the $55,000 summer proposal for 1969, the letter continues with the statement that "we were told our program was good," but should be revised. And after the revised program, (printed and bound by the St. Louis Board) was presented, "we" were then informed that the proposal was excellent but "we" were rather late.
In addition, the letter contains "a brief background summary of our Diagnostic *197 and Adjustment Center," and states "that we are now finding the need for similar kind of classrooms for children about the age of twelve, * * * Presently approximately 72 children are being served by placement in our adjustment classrooms." Surely, Mrs. Hanneken could not have believed that the supervision of the classrooms was her responsibility, rather than that of the School Board. That this is so is evidenced by the further statement in the letter that "these classrooms serve many children who might otherwise be lost to other educational efforts of the St. Louis Public School System. * * * Additional services are now being extended, experientally [sic] to three regular elementary schools." The letter concludes with the statement that "obviously this information will be useful to you in assisting us to acquire a sufficient amount of money to operate our muchneeded summer program."
Also included in the letter are adverse comments concerning the action of the State Department of Education in approving a grant to the Special School District of St. Louis County which, the letter recited, had submitted its proposal "just the week before (the St. Louis proposal was filed) for $50,000 to serve only 125 children" and that she had learned that the County District was granted the sum of $49,000. In gratuitously commenting upon this grant, Mrs. Hannekan stated (under the apparent belief that the State had offered a $30,000 grant to the St. Louis Board), "you can't tell me that our proposal being two days later than theirs would cut us $20,000 and they are just cut $1,000 and serving less children and only one handicapped. This just doesn't make sense. Besides the Special District gets money galore from federal grants which we are not even eligible for." The letter further criticized the State Board for taking the position that the St. Louis proposal was a "little late," stating that "I would like to mention here that a specific deadline has never been stated to our knowledge. Consequently we are never aware of any lateness."
The nature of the letter was such that to the extent it influenced Mr. Kopp's judgment in determining to recommend against the reemployment of Mrs. Hanneken it does not fall within the constitutionally protected area of free speech and right of petition. What was petitioned for was on behalf of the Board and Mrs. Hanneken had no authority to make such a petition. The "speech" in the letter was a representation that it expressed the views of the Board, but such representation was neither authorized nor factually correct. Mrs. Hanneken had the right to write a letter to her Representative and otherwise express her opinions as a citizen. She had no right, however, to speak for the Board or to misrepresent its position. So, too, if (as she apparently then believed, as indicated by the letter), a state official had offered to make a reduced grant of $30,000 for the St. Louis program, it was her duty to report that offer to Mr. Kopp.
The contention of Dr. Long that she was directed to discharge Mrs. Hanneken for writing the letter and was herself refused reemployment when she refused to do so is disallowed. Although Dr. Long was requested to sign the "unsatisfactory" evaluation of Mrs. Hanneken she was not directed to do so, and the request was made as a matter of courtesy. The evaluation had already been made by Mr. Kopp and no action on the part of Dr. Long was necessary to effect the termination of Mrs. Hanneken's employment, nor in truth was Mrs. Hanneken "discharged." The fact is that all Mr. Kopp could do with respect to the employment of both plaintiffs was to make recommendations to the Superintendent of Schools, and it was the Superintendent's responsibility to make the final determination, subject to Board review, as to whether the employment of either plaintiff should be continued. We note in this connection that the report relating to Mrs. Hanneken submitted by Mr. Kopp to Dr. Kottmeyer contained an *198 addendum the following day which recited in detail the refusal of Mrs. Hanneken to obey an order to report to Mr. Kopp's office and to comply with her agreement to telephone Mr. Kopp, as the result of which Mrs. Hanneken was further marked "unsatisfactory for being insubordinate." Hence, when Dr. Kottmeyer made the final decision (which the Board refused to disturb) to deny reemployment to Mrs. Hanneken he had the additional information available to him relating to her unjustified insubordination and another example of her contempt for the authority vested in Mr. Kopp.
We find and hold that the refusal to grant plaintiffs reappointment as teachers for the ensuing school year was not based on constitutionally impermissible grounds, but on the contrary was the result of the exercise of good faith discretion by Dr. Kottmeyer in the light of the facts available to him as disclosed by the recommendations of Mr. Kopp and his own appraisal of the situation.
The result we have reached makes it unnecessary to determine whether any of the defendants could be liable under the Civil Rights Act for damages as a result of the failure to grant reappointment to plaintiffs. The foregoing memorandum constitutes our findings of fact and conclusions of law. The Clerk is directed to enter judgment in favor of defendants and against plaintiffs.

APPENDIX

BOARD OF EDUCATION OF THE CITY OF ST. LOUIS
 Instruction Department Diagnostic Center and Adjustment Classes
 6651 Gravois Avenue
 St. Louis, Missouri 63116
 March 22, 1969
Mr. James Godfrey
Capitol Building
Speakers Office
Jefferson City, Missouri
Dear Mr. Godfrey:
Enclosed is the information regarding our conversation today. As I mentioned to you, during the regular school year I am the Coordinator, Supervisor and Consultant for the Diagnostic Center Classes St. Louis Board of Education under Title III, ESEA. Our office is located at 6651 Gravois and my director of Title III is Dr. Ruby D. Long. During the summer of 1968 I directed a summer program for our children (emotionally disturbed with and/or learning disabilities) and once again we are attempting to operate another program this summer but seem to be having some difficulty acquiring sufficient funds to operate a worthwhile program for 1969.
Last April, 1968 the Board of Education was informed that Federal monies under the Elementary and Secondary Act, Title VI-A were available for Handicapped Children and needed to be spent by August 1, 1968. In May of 1968 a proposal for a summer program for Seriously Emotionally Disturbed children in the sum of $35,000.00 was submitted to the Missouri State Department of Education-Special Education. On June 24, 1968 word from Jefferson City was received that a grant was issued to the Diagnostic and Adjustment CenterSt. Louis Board of Education but the amount *199 was reduced to $25,000.00. Taking into consideration that our proposal was presented late we took the monies issued but begged, borrowed and cut corners to make up the $10,000.00 difference and not affect the program. Believe it or not we had a very affective program and this was varified when Gary Steward from the State Department of Education Special Education observed our program while in progress. It was also at this time that Mr. Stewart asked if we would be interested in repeating this program for 1969.
On February 24, 1969 the Evaluation of the entire summer program was submitted (printed and bound) and again we received nothing but favorable comments. During this same date a new summer proposal for 1969 with the same format was submitted to the sum of $55,000.00. Again we were told our program was good, to make a few revisions and return it as soon as possible. On March 17, 1969 a revised addition was presented printed and bound. We were then informed the proposal was excellent, just what they wanteddirect service to kids but we were rather late, only $70,000.00 was left and Grants are given on a first come first serve basis. It was also mentioned that Special District in St. Louis County had sent in a proposal just the week before for $50,000.00 to serve only 125 children (hard of hearing) and he didn't see how they could approve two grants of this size. However, I would like to mention here that a specific deadline has never been stated to our knowledge. Consequently we are never aware of when lateness is.
Mr. Stewart also asked me what the least amount of monies would be acceptable and he was told $45,000.00. He said he would try his best but it's mighty late and he still has 15 other proposals to process before he gets to ours. However, he would let us know by the week-end which was March 20 or 21st.
On Saturday, March 22nd we met Mr. Stewart at a luncheon and again he asked how $30,000.00 sounded? He again was told it wouldn't that we could not operate under the conditions we did last year and especially if we were going to serve 60 more children we would need additional staff. He said well that's about the story it looks like it will be this nor nothing as they are going to have a meeting for approval Monday morning. I then asked if our budget was cut, how much did Special District get? His reply was $49,000.00. This Mr. Godrey I believe is the straw that broke the camels back. You can't tell me that our proposal being two days later than theirs would cut us $20,000.00 and they are just cut $1,000.00 and serving less children with only one handicap. This just doesn't make sense. Besides the Special District gets money galore from Federal Grant's which we are not even eligible for. You know that South St. Louis because of it's "economic status" has never before been eligible for Federal monies until a Grant under Title III was issued three years ago for which I am presently working. You know how important South St. Louis area is in the effectiveness of St. Louis Public Schools which should be a selling point in itself, and further more these are the kids who cannot participate in any Scout, Camping or social activities because of their poor behavior which is all in the more reason why we should have a program such as ours.
It might be of help to you to know that money is issued by the Missouri State Department of EducationSpecial Education, Elementary and Secondary Act, Title VI-A under the directorship of Donald Cox, coordinator of Title Vi, Public Law-89-750.
Now for a brief background summary of our Diagnostic and Adjustment Center.
1. The Center serves to identify and also services to remediate children *200 with learning disabilities and/or characteristics of emotionally disturbance.
2. These services are directed toward 13 designated schools in the South St. Louis area.
3. The age group serves a range from 6 to 12 year old. We are now finding the need for similar kinds of classrooms for children above the age of 12.
4. Presently approximately 72 children are being served by placement in our Adjustment classrooms. These classrooms serve many children who may otherwise be lost to other educational efforts of the St. Louis Public School system; ego withdrawals, suspensions, etc.
5. Additionally services are now being extended, experimentally, to 3 regular elementary schools in an effort to further said services to children who proportidly can remain in the regular classroom. These preventative measures can be aimed in reducing the number (increased) of drop-outs, disturbed children.
More specific information is on hand if more is desired. Hopefully, this information will be useful to you in assisting us to acquire a sufficient amount of money to operate our much needed summer program.
If there is any way which we could help you to justify this program please do not hesitate to call me either at home Ve 2-0289 or at the office Fl 3-9260.
Thanks again Mr. Godfrey for any assistance you might be able to give us.
 Respectfully,
 (s) Jane Hanneken
 Jane Hanneken, M.A.
 Supervisor of Physical Education
 and/or Motor-Percoptual
 Skills
NOTES
[1] The letter is set forth in full in an appendix hereto.