Stephen L. **ROZMAN**, Plaintiff,

v.

J. G. **ELLIOTT** et al., Defendants.

No. CV71–L–130.

United States District Court,
D. Nebraska.

Nov. 18, 1971.

the sets of interests is the labor of the court. For reasons hereinafter expressed I conclude that the plaintiff professor passed beyond the perimeters of protected freedom of expression, assembly and petition and, therefore, that the nonrenewal of his contract was permissible by the university. I offer no view as to the wisdom of the university's action, for to do so would surpass my realm of authority. In no sense am I guided by the rights of private employers to hire or not to hire whom they choose. Private employers are not limited by the Fourteenth Amendment of the Constitution, but public employers are. That amendment prohibits a university, as an arm of the state, from depriving a citizen of life, liberty, or property without due process of law, which means that the university cannot fail to reappoint a nontenured faculty member arbitrarily or capriciously or for constitutionally impermissible reasons, such as race, religion, or the exercise of rights protected by the Constitution. Freeman v. Gould Special School District of Lincoln County, Ark., 405 F.2d 1153 (C.A. 8th Cir. 1969).

## FINDINGS OF FACT REGARDING PROCEEDINGS LEADING TO NONRENEWAL OF CONTRACT

Prior to May 4, 1970, and until the end of the regular academic year in June, 1971, the plaintiff, Stephen L. Rozman, was employed by the Board of Regents of the University of Nebraska as an assistant professer without tenure in the Department of Political Science and the College of Arts and Sciences at a salary of $10,800.00. The University of Nebraska provided and does provide a tenure system, but tenure had not been accorded to Stephen L. Rozman, whose contract was on a year-to-year basis for the academic year commencing in September and terminating on commencement day in June. Under the bylaws of the Board of Regents an assistant professor without tenure could expect in the ordinary course of events that he would be reappointed for another year, unless he was notified to the contrary on or before the 15th day of December immediately

Patrick W. Healey, Lincoln, Neb., for plaintiff.

Flavel A. Wright, Lincoln, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, District Judge.

A nontenured associate professor seeks relief from a decision of the governing board of a public university not to renew his contract of employment because of his activities outside the classroom.

■■■ The competing interests in the dispute are that of freedom of expression, assembly and petition on the one hand and freedom to employ or not to employ on the other. Neither set of interests is absolute. Identifying the finely honed edge which cuts between

preceding the expiration of his latest appointment year, unless some unforeseen financial exigency later rendered his reappointment impossible or unwise in the judgment of the Board of Regents.

On May 4 and 5, 1970, Dr. Rozman was involved in two demonstrations in protest of President Nixon's decision to cause a military invasion of Cambodia and of the killing and wounding of students at Kent State. As a result of those demonstrations, the Board of Regents directed the chancellor of the university to commence immediately an inquiry "in which the sequence of events and the involvement of faculty and students will be determined." Nonuniversity personnel were selected as members of the Commission of Inquiry on Disruptive Actions on the University of Nebraska Campus at Lincoln, which came to be known as the Spelts Commission. It issued its report on August 18, 1970, containing many findings and recommendations, including the statement:

> "The Commission considers improper the action of faculty member Stephen Rozman for his participation in the demonstrations. The Commission recognizes Mr. Rozman's right to voice his opinions. His actions were highly inappropriate for a teacher."

The Board of Regents then directed the chancellor of the University of Nebraska and the president of the University of Nebraska-Lincoln to refer to the proper faculty committee the question: "In view of the actions and utterances of Professor Stephen L. Rozman during the period May 4, 5, and 6, 1970, what sanctions should be applied?" A referral was made to the Academic Privilege & Tenure Committee, but no final action was taken by that committee because it considered that it should not be an investigative body for marshaling the evidence and the university administration thought it should not be in the role of presenting the evidence, because the administration then would be in the position of a prosecutor. During the ensuing weeks Dr. Rozman pressed the committee for action.

At the meeting of the Board of Regents on November 20, 1970, consideration was given to the possibility of Dr. Rozman's reappointment. The board then directed the administration to inform Dr. Rozman that he might not be reappointed for the 1971–72 academic year, pending a report which it requested from the university counsel. Such notice was given and as the preestablished deadline of December 15 for giving notice of nonreappointment approached, Dr. Rozman became aware that the Board of Regents would hold a meeting on December 14, 1970, at which the subject of reappointment might be presented. Other persons, including one or more representatives of the American Association of University Professors and faculty members of the University of Nebraska, initiated conferences which led to an agreement between Dr. Rozman and the Board of Regents by which the date on which Dr. Rozman was entitled to have notice concerning reappointment or nonreappointment was extended from December 15, 1970, to February 15, 1971, and by which a fact-finding committee would be appointed for hearing witnesses without cross-examination and submit to the Board of Regents a report not later than February 1, 1971. It was contemplated in the agreement that the committee would have the opportunity "to advise and consult with the Board of Regents with respect to the committee's findings prior to Board action."

The result of the agreement was the selection of a Special Faculty Fact-Finding Committee re Stephen Rozman Matter University of Nebraska. The committee took testimony of 45 separate witnesses, the transcript of which consists of 1,074 pages. Dr. Rozman testified twice, after receiving a copy of the "statement of areas of concern relating to reappointment of Dr. Stephen L. Rozman." This statement was prepared by the university's counsel and outlined the activities of Dr. Rozman about which the Board of Regents was concerned. Counsel of Dr. Rozman and of the university were invited to be present at the taking of the

testimony, but each declined to do so. A full transcript of the testimony before the committee, known as the Holtzclaw Committee, was submitted with the committee's report to individual members of the Board of Regents on February 2, 1971. On the evening of February 5, 1971, the Holtzclaw Committee met with the Board of Regents in accordance with the earlier understanding of Dr. Rozman and the Board of Regents. Discussion of the Rozman matter occurred, but no decision was made by the Board of Regents either formally or informally regarding the reappointment of Dr. Rozman. On February 6, 1971, at a regularly scheduled and duly constituted meeting of the Board of Regents, the board unanimously adopted a resolution providing that the contract of Dr. Rozman would not be renewed and would expire at the end of the term in June, 1971. Pursuant to that action, notice in writing that his contract would not be renewed was delivered to Dr. Rozman prior to February 15, 1971.

The resolution of the Board of Regents directing nonrenewal of the contract contained a statement of the factors considered by the board and constitutes the only evidence of the reasons for nonrenewal, as follows:

"A. Dr. Rozman did not initiate the plan to occupy the Military and Naval Science Building.

"B. Although Dr. Rozman was not actively involved with the group in the earlier stages, he subsequently took an active part and acted as a negotiator for the students in their efforts to obtain from the University a 'statement of solidarity' providing that the University, as an institution, shared the indignation of the students with the developments in Cambodia and at Kent State. Dr. Rozman was aware of the position of Dr. Soshnik that this involved the University as an institution in a political statement which was an area in which the administration could not commit the University.

"C. Dr. Rozman was aware of the fact that the University administrators were concerned with getting the students to leave the building voluntarily and were reluctant to call in police because such action might precipitate violence, injury or damage to property. Dr. Rozman apparently shared these views of the administrators, but took a firm stand that the University would have to take an institutional position expressing indignation with the Cambodian and Kent State situations.

"D. In an effort to obtain an agreement which would permit a voluntary evacuation of the building by the students, President Soshnik, Dean Ross and Dean McGrath (sic) in collaboration with some faculty and at least one student, developed a statement of sympathy for the students' problems in this area and presented it to the group with which Dr. Rozman was then associated as a negotiator. Dr. Rozman promptly characterized this statement as 'weak' and as 'insufficient' and so advised Al Siporin (a student who has been characterized as one of the leaders of the group) and some others in the group with whom Dr. Rozman had communication. It was finally determined that the statement would be read to all of the persons in the 'pit' area. This was done by Dr. Soshnik and the initial response was one of sustained applause. This circumstance has been interpreted by Dr. Rozman as demonstrating sympathy for the position of Dr. Soshnik and appreciation for his willingness to work through the night with the students. President Soshnik, Dean Ross and Dean McGrath (sic) then left the building and a student then suggested they had accomplished their purpose and should vacate the building. Speakers other than Dr. Rozman then spoke against such action and the occupation then settled into a long discussion in which Dr. Rozman, on occasions in communicating with some members of the group, characterized Dr. Soshnik's statement as 'weak' and that it did not show anything approaching solidarity.

"E. Dr. Rozman testified with reference to his feelings toward the occupation of the building:

'Now if you're talking to me about disobeying of the law by sitting in at the ROTC Building, I don't think that I had any obligation to act against that; if it had been distruction [sic] that's one thing, I felt it was a meaningful means of communication. I did not oppose the sit-in, I did not organize it, I did not lead it, I took no role, I didn't, in moving the students to the ROTC Building, and I came in a second grouping, I was not among the first grouping to come, so I felt there was a meaningful form of communication.'

"Later he stated:

'Sitting in a, in a building, an ROTC Building, which was done, I think that that at that time was a meaningful, very meaningful form of communication, I think any other form that could have been chosen that people would have felt dramatic enough would have been more extreme. I think that was the most meaningful form of communication within a peaceful framework.'

"Later he stated:

'Well, they left the building, after Soshnik read his statement, they left the building, a vote was taken, people offered to stay, a lot of students remained and I thought that as long as a lot of people were remaining and that I felt that this was a meaningful form of communication, I would remain.'

"F. Dr. Rozman did not at any time attempt to persuade the students to leave although he knew the University administration was vitally interested in accomplishing that fact.

"G. On the morning of May 5th, while Dr. Rozman was in the Military and Naval Science Building, he was advised that the University then considered the continued occupation of the building by him and the students to be disruptive and he and the others were directed to vacate the building. He failed to do so and continued to remain with the students and continued to refuse to vacate the building. Dr. Rozman was present in the Military and Naval Science Building during the period from 6:30 a. m. to 8:30 a. m. May 5, 1970, during which all of the students and Dr. Rozman had been directed to vacate the building and had been advised that the administration considered the demonstration had reached the point where it was disrupting normal University activities. The committee reports at that time:

'There was a feeling of betrayal and a resolve to resist arrest by sitting with linked arms. The mood was sad, disillusioned, and somewhat fearful of what would happen when the police arrived to make arrests.'

"Even under these circumstances, Dr. Rozman did not suggest the possibility of leaving the premises to any of the students nor did he leave.

"H. In an effort to cause the persons including Dr. Rozman to leave the building so that it could be used in carrying out the normal functions of the University and on the basis of legal advice, the administrators of the University caused an injunction proceeding to be filed in the District Court of Lancaster County, Nebraska. Because Dr. Rozman was a part of the group which refused to vacate the building after he had been so instructed, and since he was known by name to the administrators involved, it was necessary to designate him as a defendant in the action. Whether because of the institution of the injunction proceedings or because of the efforts of faculty members or for some other reason, a voluntary evacuation of the building was accomplished on the morning of May 5, 1970."

Each of the factors related in the resolution was supported by substantial evidence in possession of the Board of Regents at the time of the making of the resolution from the testimony taken by the Holtzclaw Committee, although not all were supported by the report of the Holtzclaw Committee.

The resolution also contained as paragraph numbered 8 the following:

"Subsequent to the evacuation of the building, Dr. Rozman has publicly characterized statements made by Vice Chancellor Ross in connection with the affidavit filed in the injunction proceeding as 'lies.' This Board respects Dr. Rozman's right to disagree with statements in said affidavit or in the injunction proceeding, but does not approve of the practice of publicly declaring that matters with which one does not agree are 'lies.' Board policy in this regard is consistent with the following statement from the Scranton Report:

'Harsh and bitter rehtoric can set citizen against citizen, exacerbate tension and encourage violence.' "

Although this statement is not supported by the report of the Holtzclaw Committee, the statement was substantiated by a written statement presented by Dr. Rozman to the Holtzclaw Committee which contained the following:

"The next area of charges relates to Dr. Ross' affidavit; and I am criticized for having chastized Ross for 'lies contained in the affidavit.' I admit that I made such a statement, and I have nothing to retract at this time."

FINDINGS OF FACT RELATING
TO EVENTS OF MAY, 1970,
DEMONSTRATIONS

At about 1:30 p. m. on May 4, 1970, a group of University of Nebraska students met on the campus and decided to walk to the Terminal Building in Lincoln, where the draft board was located. Dr. Rozman followed a few minutes later and joined the others at the Terminal Building. The purpose of the group, including Dr. Rozman, was to let the draft board know that the persons in the group were opposed to the Cambodian invasion, which had been announced by President Nixon about three days earlier. Most of the group went to the ninth floor of the Terminal Building, where they were noisy but not destructive, although one person in the group had broken a door on a lower floor to get to the ninth floor. A police officer arrived at the door of the draft board on the ninth floor and permitted small groups of persons into the draft board. One of those small groups included Dr. Rozman, who had identified himself to the police officer as a faculty member. Dr. Rozman urged the closing of the draft board office for the rest of the afternoon in protest of the Cambodian incursion, but no closing occurred. In the course of time the police ordered the group to leave and most of the group, including Dr. Rozman, left. Some of the students remained and were arrested and Dr. Rozman spent a major portion of the remainder of the afternoon at the police station assisting the arrested students in obtaining release to an attorney.

In the early evening of May 4 Dr. Rozman heard that there would be a meeting at the U.M.H.E. Building on the campus. He went home for supper and heard of the tragic killings at Kent State and decided that he would attend the meeting at the U.M.H.E. Building. At the meeting one or more students suggested a peaceful sit-in at the ROTC Building (Military and Naval Science Building) on the campus and about half the group left. Dr. Rozman waited and then decided that such a sit-in would be an excellent form of communication to President Nixon, because the ROTC was a part of the military establishment and such a sit-in should receive considerable publicity. Rozman then went to the ASUN Building on the campus and then at about 8:15 p. m. arrived at the Military and Naval Science Building, where he entered by an open door and spent the next three hours, approximately, sitting, listening to a rock band, and observing and listening to persons making statements over a microphone regarding Cambodia.

The crowd swelled during the course of the late evening with the arrival of many students and towns-people, so that several hundred persons were in the building most of the night. The number reached its peak at around midnight and then

tapered off until the occupancy ended shortly before 10:00 a. m. on May 5. Most of the persons were in the area on the first floor known as "the pit."

At approximately 10:00 p. m. on May 4 the students drew up a list of demands, acclaimed two students, Al Siporin and Dan Ladely, spokesmen to meet with administrators. Administrators who arrived at perhaps 10:00 p. m. were: Joseph Soshnik, President of the University of Nebraska-Lincoln; G. Robert Ross, Vice Chancellor and Dean of Student Affairs; and C. Peter Magrath, Dean of Faculties. Some members of the faculty Liaison Committee came at the request of the administration. These administrators and some of the Liaison Committee met with Siporin, Ladely and other students in a separate room for the negotiating of the demands of the students and the relinquishment of occupancy of the building. Dr. Rozman first became aware of the negotiating session at about 11:00 p. m. When he found out that the meeting was taking place, he, in his words "did seek entry into the room and, as a faculty member, received it." The mood of the group in the "pit" varied from festive to tense. In the negotiating room the atmosphere was one of earnestness and from the administrators' viewpoint tense. Statements were made in the negotiating room that there were people in the pit who might want violence no matter what was done. Assertions were made in the negotiating room that the building "is ours now." Dr. Rozman made none of these statements and did not participate in the presentation of the original demands of the students. He did become engaged in a debate with the administrators over whether the administration of the university should take a stand on the Cambodian incursion. He pressed vigorously for a statement of solidarity by the president of the University of Nebraska-Lincoln to the effect that the university, as an institution, shared the indignation of the students with the developments in Cambodia and at Kent State. During these negotiations the administrators stated their unwillingness and inability to commit the university, as an institution, to a political statement. Dr. Rozman was aware of that position and was aware of the interest of the administration in getting the students and others in the building to leave the building voluntarily and of the reluctance of the university officials to call in police, because such action might precipitate violence, injury or damage to property. At about 1:00 a. m. on May 5 the administrators left the negotiating room and developed a written statement of sympathy for the students' problems in the areas involved, and at about 3:00 a. m. returned to the negotiating room and presented the statement to the negotiators, including Dr. Rozman. One of the student negotiators consulted him about the appropriateness of the statement of the administrators and Dr. Rozman replied that he did not think that it would satisfy the occupants outside the negotiating room because it was not strong enough. The student then expressed to President Soshnik his dissatisfaction with the statement.

Dr. Rozman saw his role in the negotiations, as found by the Holtzclaw Committee, as follows:

"Dr. Rozman contends that he entered the negotiating room and attempted to help formulate a statement that would be acceptable to those occupying the building. He admits that when he negotiates, he feels that he must ignore hierarchy. He testified that he was convinced that if the statement presented to the occupants of the building were unsatisfactory, and if they were forced to leave while still upset, the situation would be considerably more dangerous than if they left after receiving a satisfactory statement or— as a second choice—than if they remained in the building."

Dr. Rozman characterized his role as follows:

"I was interested in breaking the stalemate, something I felt would be warmly welcomed by both sides. As a political scientist who teaches interna-

tional relations and, hence, techniques of diplomacy, I thought that I could help bring about a settlement. I began by suggesting to the three administrators that a rewording of the statement might lead to its being accepted as one of solidarity. Dean Magrath replied that the statement, as written, manifested strong sympathy. Since it was evident to me that the students, by their reactions, did not consider it to be satisfactory, and since I felt that it contained little more than carefully selected cliches, I suggested to Dean Magrath that the statement at best reflected understanding but was not being interpreted as showing sympathy. He then admitted that it did not take the side of the students and claimed that the political issues involved were too controversial to allow the administration to take a stand with the students. I commented that if he felt this way, he should not attempt to falsely represent the statement. But I must stress that I did not make these comments until the students had already reacted negatively toward the statement. President Soshnik echoed Dean Magrath's position by claiming that he, as an administrator, could not take a political stand. At this point, I referred to Yale's president, Kingman Brewster, to provide an example of administration condemnation of the Cambodian adventure."

Several of the witnesses testifying before the Holtzclaw Committee, including President Soshnik, felt that the comparison with Kingman Brewster was insulting. It is clear that Dr. Rozman did not support the administration's statement and did argue for a stronger statement. In this sense, he was uncooperative.

At about 3:00 a. m. the statement[1] prepared by the university administrators was read to the group of students and others in the "pit." It related that to the administration's knowledge there had been no rules or laws broken that would involve university disciplinary action. It also announced a special meeting of the faculty to be held at noon on May 5 in the Nebraska Union and stated that further discussions for the general university community would be held at 2:00 p. m. on May 5 in the University Coliseum. All students and faculty were urged to participate. Reading of the statement resulted in an initial response of applause. One or more persons—not Dr. Rozman—took the microphone and denounced the statement. One or more other persons—not Dr. Rozman—took the microphone and suggested that the group leave the building. Dr. Rozman in one or more conversations to individuals characterized the statement as weak. A vote was taken and most of the occupants voted to remain in the building and did so.

Dr. Rozman was one of those who remained in the "pit." At no time did he attempt to persuade anyone to leave the building and at no time did he urge others to remain, except as his presence might have been so interpreted. From sometime after 3:00 a. m. until about 7:30 a. m. the group in the "pit," including Dr. Rozman, was quiet and, for the most part, sleeping. Until about 6:00 a. m. those in the building felt, apparently from statements made or thought to have been made by the administrators, that they had permission to be there and thought that they had the following understanding with the administration: That the presence of a token group of demonstrators in the "pit" of the Military and Naval Science Building would not be construed as disruptive so long as the group remained quiet and peaceful. At about 6:00 a. m. one of the administrators told the group that they could remain as long as they stayed in the "pit" and were not disruptive. There had been conversations regarding the reduction of the numbers to a token group of perhaps 20, but the idea was rejected by the group of demonstrators and about 200 remained through the night.

One of the demands of the students presented to the negotiating group in the

1. Exhibit 72.

early evening was that the ROTC program at the university be suspended. Before 3:00 a. m. on May 5 Dr. Rozman and the other members of the group knew that an ROTC class was scheduled to be held at 7:30 a. m. It was to be held on the first floor in a room adjacent to the "pit" area. One of the administrators had heard earlier in the night, at approximately 1:00 or 1:30 a. m., a person—not Dr. Rozman—say that if any ROTC officers or students came in that building he was going to call them out and if they responded he was going to throw them over the balcony. The same administrator, G. Robert Ross, heard some members —not Dr. Rozman—of the group say that they were anxious to kill anyone who would try to go to a class in the room. Probably between 6:00 a. m. and 7:30 a. m. Dr. Soshnik and ROTC personnel decided to cancel the 7:30 ROTC class because of the demonstrators' presence.

Throughout the night there was no assurance or attempted assurance to the administrators by the occupiers of the building that the occupancy would end, or be reduced to a token number, by the time the 7:30 ROTC class was supposed to meet. The administrators reasonably concluded that the presence of 200 people in the "pit" would continue, as it did, at and after 7:30 a. m. and that such presence would prevent or interfere with the conduct of the ROTC class.

At about 8:30 a. m. Dr. Soshnik appeared at the "pit" and read to the assembled group a statement to the effect that the university officials had concluded that the group's continued presence and occupation of the premises then constituted disruptive or potentially disruptive conduct, which "now interferes or will interfere with the university's work or with the rights of students, and that acts of violence or substantial disorder are likely to result under the present circumstances." The statement then informed the group that they were allowed a period of 15 minutes to accomplish an orderly evacuation of the premises and to arrange for a more appropriate meeting time and place for discussions. It further warned that those who failed to comply with the instructions by remaining on the premises would be subject to penalties provided by law and university regulations. Dr. Soshnik also read a notice which requested the group promptly to vacate the building and informed the group that a petition for an injunction had been or would be filed that morning in the District Court of Lancaster County, Nebraska, with a request for an order restraining the persons there from occupying the premises. The notice announced that a hearing would be held before Judge William Hastings at 9:15 a. m. that morning and that transportation would be provided for anybody who wanted to appear at the hearing. Most of the group, including Dr. Rozman, remained in the building after the statement and notice were read. Some of the students and Dr. Rozman sat in the building with linked arms in a mutual declaration of solidarity.

Injunction proceedings were filed, but before the hearing was concluded an evacuation of the Military and Naval Science Building occurred. The evacuation of the last 100 persons, including Dr. Rozman, occurred about 9:55 a. m., largely for the purpose of attending a special faculty meeting called to discuss the Cambodian issue. No restraining order, accordingly, was entered.

The petition filed in the District Court of Lancaster County, Nebraska, and the affidavit in support of the petition contained statements directly involving Dr. Rozman, with which he took issue. He sought and obtained on May 6 an interview with Dean G. Robert Ross, who had signed the affidavit, and put in letter form his objections. A response to the letter was made in writing on May 7. Apparently the same day a public encounter occurred between these two men at which Dr. Rozman demanded a public apology, branding statements in the petition and affidavit as untrue. Although substantial evidence existed, as hereinbefore noted, that Rozman characterized the statements in the affidavit or petition as "lies," I conclude that whether

that word or any of its forms was used is of no importance in the resolution of this case. Similarly, Dr. Rozman had a public discussion with President Soshnik in which Rozman's most memorable statement, in response to President Soshnik's statement concerning possible armed intervention on the campus, was "For crying out loud, President Soshnik!" President Soshnik took umbrage and asked for an apology, which was forthcoming immediately. There was neither profane nor obscene language used by Rozman in that exchange.

## APPLICATION OF FACTS TO PRINCIPLES OF LAW

By statute the Board of Regents has the broad responsibility for government of the University of Nebraska.[2] Included are the powers to elect and, when the interests of the university shall require it, to remove the chancellor, deans, professors, associate professors, assistant professors, instructors, other members of the faculty staff, and employees generally.[3] This statutory declaration arises from the Constitution of the State of Nebraska.[4] Thus, there is no question of the authority of the Board of Regents to fail to reemploy Stephen L. Rozman, unless, as previously observed, it did so in deprival of due process of law. The inquiry touching due process must be broken into three areas: (1) whether the Board of Regents acted arbitrarily or capriciously, (2) whether the Board of Regents acted for constitutionally impermissible reasons, such as race, religion, or the exercise of rights protected by the Constitution, and (3) whether the Board of Regents acted without affording Dr. Rozman a proper hearing.

■■ That the Board of Regents did not act arbitrarily and capriciously follows necessarily from the finding that each of the factors related in the Board of Regent's resolution of nonreappointment was supported by substantial evidence in the possession of the Board of Regents at the time of the making of the resolution. The measure of arbitrariness or capriciousness is not the wisdom of the action or the acting in consonance with the preponderance of the evidence before it, but whether a reasonable person *could have found* that one or more of the actions of Rozman, related in the resolution, demonstrated a quality which was inimical to the university. Such finding was within the broad discretion of a reasonable man, because the factors were rooted in sworn testimony of witnesses and a written statement of Rozman. A rational connection existed between the factors and legitimate interests of the Board of Regents in the quality of faculty members. Fitness for faculty status is not limited to performance in the classroom alone. It rests upon a broad range of factors, Beilan v. Board of Public Education, School District of Philadelphia, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958), including numerous personality and character traits. Smith v. Board of Education, 365 F.2d 770 (C.A. 8th Cir. 1966).

■ As to whether the failure to reappoint sprang from constitutionality impermissible reasons, determination of that issue turns on whether all things done by Dr. Rozman within the factors outlined in the resolution were protected constitutionally as speech, assembly, and petition. I think in the context of this case the three rights of speech, assembly, and petition are so enmeshed that they are coextensive and can be dealt with most understandably in terms of speech.

Two areas of activity of Dr. Rozman were outside the scope of constitutionally protected speech: One was in the negotiating room, when he intruded into the responsibilities of the administrators for negotiating an evacuation of the building; the other was in the "pit," when by his presence he contributed to a cancellation of a class and defied a directive of the administration to leave the building promptly.

2. Section 85–103, Nebraska R.R.S.1943.

3. Section 85–106, Nebraska R.R.S.1943.

4. Article VII, Sec. 10, Constitution of the State of Nebraska.

I am thoroughly persuaded that Professor Rozman had a right to present his views by voice and physical presence about the Cambodian incursion and the Kent State tragedy. A time came in the negotiating room, however, when he abandoned temporarily the process of communicating about those subjects and assumed without invitation the role of attempting to break what he viewed to be an impasse. When he, "as a political scientist who teaches . . . techniques of diplomacy," pressed for a stronger statement by the administrators, asserting that such a stronger statement would be necessary in order to reach a settlement, he impinged upon the duties of the administrators. As negotiators for the university, the administrators had a right to negotiate in the manner chosen by them, as distinguished from the manner chosen by Dr. Rozman. At that point Dr. Rozman was not merely expressing a view as to the rightness or wrongness of the merits of the controversy, but was clothing himself with a procedural function belonging to the administrators. That kind of intermeddling is not protected by the Constitution.

In no way am I suggesting that a faculty member must parrot on substantive issues the views of the administration. I do say, however, that a faculty member cannot assume, under the protective umbrella of the federal Constitution, the role of or intrude into another's rightful role of conducting the workings of a university. His cooperativeness to that extent, at least, was a matter of proper concern of the Board of Regents, who had to decide whether he was the kind of faculty member who should be employed by the university.

The occupation of the "pit" throughout the night and into the morning of May 5 resulted reasonably in the cancellation of a class. Although Dr. Rozman's testimony was that he would have respected the rights of the students to attend class and that in his opinion the rest of the group similarly would have acted, the administrators were not unreasonable in concluding to the contrary. They had heard direct threats of interference with any student who would attempt to attend class. A fair reading of Tinker v. Des Moines Ind. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, (1969) and Esteban v. Central Missouri State College, 415 F.2d 1077 (C.A. 8th Cir. 1969), is persuasive for the proposition that potentially disruptive conduct is sufficient to remove the conduct from protected freedom of expression. In the *Esteban* case the court said:

"It is obvious that where there is actual or potentially disruptive conduct, or disorder or disturbance by the petitioners, or interference with the work of the school or of the rights of other students, or threats or acts of violence on the school premises, or substantive disorder, then reasonable action by school authorities is constitutionally permitted. There must, however, be more than mere fear and apprehension of possible disturbance." 415 F.2d at p. 1087

In the present case there were threats of violence and threats of interference with the work of the school and of the rights of other students. The school authorities reasonably could and did conclude that wisdom dictated the cancellation of the class. It will not do for Professor Rozman to claim that neither he nor most of the others in the group would have interfered with the class. When one chooses to join a group which is largely leaderless and unstructured, he must assume, not only the benefits of the group, but the disabilities of the group, as well. One of those disabilities is that those dealing with the group must remain uncertain as to whether a declaration by one or a few members represents the views only of the declarers or of more or all members of the group. When the group chooses not to communicate with a united voice, it must bear the consequences of splintered voices. One of the consequences in the present case was that the normal work of the university in holding an ROTC class and the rights of other students to attend that class were impeded.

In connection with the interference with the ROTC class, it must be noted that neither the group as a whole nor any part of it gave any assurance to the administration during the night that there would be no occupation of the building by the time the class was scheduled to meet, or even that the occupation would be by a token force sufficiently small to result in the probability of no interference with the class. Despite all efforts, 200 persons remained in the "pit" at the hour of the scheduled class meeting. It was not unreasonable to suppose that a class could not have been conducted freely under those conditions.

Of similar import is the remaining of many persons, including Dr. Rozman, after President Soshnik read to the group two directives[5] to vacate promptly the building. Irrespective of what members of the group earlier had thought, they now knew that they were being ordered to leave and that legal action was imminent. Dr. Rozman and others chose to remain and linked their arms. The precise meaning of the decision to remain and of the linking of the arms is not discernible. Again, one of the shortcomings of using mere presence or linking of arms as a means of communication is its extraordinary vagueness. Presumably, each person in the group was being permitted by each other person to interpret the presence and linking of arms as he chose to interpret them. The same discretion must be given to the observer, and thus a symbol is no more meaningful to the observer than his interpretation of it. It is certain that one reasonable interpretation of Dr. Rozman's remaining and linking arms with others after the reading of the directives is that he was defying the directives. It reasonably could be interpreted, also, as an intention to defy any forthcoming court order.

■■ The demand of the administration to vacate was reasonable under the circumstances. Although Dr. Rozman did not give up his right to freedom of speech, assembly, or petition by teaching at the University of Nebraska, he did undertake obligations of cooperation with reasonable directives of the administration. Insubordination is a proper ground for nonrenewal of a contract, even when it becomes enmeshed with the reliance upon constitutional rights, Nelson v. Los Angeles County, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1960), at least where reasonable alternatives for expression of dissent are available, as they were in the present case.

John Stuart Mill in 1859 provided the philosophical underpinnings for a rare, but justifiable, governmental interference with personal freedom. He said:

"The object of this essay is to assert one very simple principle, as entitled to govern absolutely the dealings of society with the individual in the way of compulsion and control, whether the means used be physical force in the form of legal penalties or the moral coercion of public opinion. That principle is that the sole end for which mankind are warranted, individually or collectively, in interfering with the liberty of action of any of their number is self-protection. That the only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinions of others, to do so would be wise or even right. These are good reasons for remonstrating with him, or reasoning with him, or persuading him, or entreating him, but not for compelling him or visiting him with any evil in case he do otherwise. To justify that, the conduct from which it is desired to deter him must be calculated to produce evil to someone else. The only part of the conduct of anyone for which he is amenable to

5. Exhibits 70 and 71.

society is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute. Over himself, over his own body and mind, the individual is sovereign." John Stuart Mill, "On Liberty," (Currin v. Shields ed. 1956)

Professor Rozman's activities on the night of May 4 and 5 in the two instances outlined were within the government's right to control, because they were intrusive upon the rights of others.

As to whether Professor Rozman was afforded a proper hearing, I conclude that he was. Although it may be true that constitutionally a hearing was not required within the principles of Freeman v. Gould Special School District of Lincoln County, Ark., supra, I think that the Board of Regents' act of appointing the Holtzclaw Committee obligated it to proceed with at least minimal procedural safeguards. Cf. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). In my view the hearing before the Holtzclaw Committee constituted a compliance with the full panoply of procedural safeguards, except one, the right of cross-examination, which specially was waived by Professor Rozman after consultation with his counsel. Furthermore, to the extent that the hearing before the Holtzclaw Committee was substituted for a hearing before the Board of Regents, Dr. Rozman is not in a position to complain, because the matters of submission for fact-finding purposes to the Holtzclaw Committee, the procedures of the Holtzclaw Committee, and the personnel of the committee were specifically approved by Dr. Rozman and his counsel.

■■ Peripheral issues raised by Dr. Rozman in this case, such as the assertion that the Board of Regents held a *sub rosa* meeting with the Holtzclaw Committee in violation of Nebraska law, are unfounded. The single informal meeting between members of the Board of Regents and members of the Holtzclaw Committee was expressly anticipated by the agreement between Dr. Rozman and the Board of

Regents before the Holtzclaw Committee was constituted, and the Board of Regents reached no agreement and took no official action at that meeting. Neither am I impressed with the plaintiff's urging that he has been pinned by the Board of Regents with a "badge of infamy." This charge appears essentially to be tied to publicity and the use of complicated procedural machinery. There is no more evidence that the Board of Regents was responsible for publicity than that Professor Rozman was responsible for it. The procedural act of submitting the dispute initially to the Spelts Commission by the Board of Regents was not motivated in the least by any intention to mar the name or reputation of Dr. Rozman. The subsequent reference to the academic committee on privilege and tenure was in accordance with previously established procedures and Professor Rozman, rather than objecting to the procedure, prodded the committee to action and, even at the trial, insisted that he would have liked to have had a decision by that committee. Submission of the controversy to the Holtzclaw Committee was endorsed fully by Dr. Rozman and his counsel.

Commendation is due counsel in this case. Advocacy of the highest order has characterized the entire presentation. The plaintiff's brief, while unavailing, is noteworthy as a skillful analysis of a massive collection of relevant cases.

Judgment will be entered today for the defendants.

## MEMORANDUM RE POST-JUDGMENT MOTION OR JUDGMENT FOR NEW TRIAL

The plaintiff seeks by motion to obtain judgment in his favor or a new trial. Oral argument of that motion on December 17, 1971, developed two principal contentions, which the plaintiff correctly suggests were not thoroughly covered by the memorandum of decision of November 18, 1971.

■ Prior to an exploration of those two matters, however, I shall revisit and

alter a declaration in the memorandum of decision, dated November 18, 1971. One paragraph of the memorandum states in part:

"As to whether Professor Rozman was afforded a proper hearing, I conclude that he was. Although it may be true that constitutionally a hearing was not required within the principles of Freeman v. Gould Special School District of Lincoln County, Ark., supra, I think that the Board of Regents' act of appointing the Holtzclaw Committee obligated it to proceed with at least minimal procedural safeguards. Cf. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). . . ."

Vitarelli v. Seaton certainly does not require a conclusion that the Board's appointment of the Holtzclaw Committee obligated the Board to afford a due process hearing. *Vitarelli* holds that a federal administrative agency must follow its own procedural rules regarding discharge of employees on security grounds, when it decides to proceed with discharge of an employee on security grounds. That holding was not born of the Constitution, and I doubt that its principle can be found in the Constitution.

On reflection it seems to me that if a constitutional right to a particular kind of hearing does not exist, as the *Freeman* case appears to say, such a constitutional right cannot be created by a decision of the Board of Regents to grant a hearing which may or may not fit the description of that particular kind of hearing. As a matter of policy, it seems to me unwise to dampen a board of regents' willingness to grant hearings. Even an imperfect hearing, if held with the approval of the employee, is better than no hearing at all. A rule of law that a decision to grant any kind of hearing —even though not constitutionally required—automatically burgeons into a constitutionally imposed duty to follow all or some undefined segment of the elements of procedural due process, would do more to abort impendent deci-

sions to grant hearings than it would gain in procedural protections.

Thus, I conclude that *Freeman* means that no hearing was required in this matter and that the decision of the Board of Regents to have a hearing before the Holtzclaw Committee did not impose upon the Board the duty to abide by any particular procedural requirement of the due process clause of the Constitution of the United States. The memorandum of decision of November 18, 1971, is revised so that the paragraph, of which a portion has been quoted herein, will state as follows:

"With respect to the procedures followed by the Holtzclaw Committee and the Board of Regents at its meeting of February 6, 1971, I conclude that the case of Freeman v. Gould Special School District of Lincoln County, Ark., supra, dictates that no hearing was required to be given. The voluntary decision by the Board of Regents, assented to in its procedural particulars by Dr. Rozman and his counsel, did not result in constitutionally guaranteed rights to have the hearing conducted in any particular manner. I note that the submission to the Holtzclaw Committee for fact-finding purposes, the identity of the personnel of the committee, and the method of procedure used by the committee, were approved in advance by Dr. Rozman and his counsel."

Nevertheless, on the assumption that the Board was required to abide by procedural due process, I now explore the two contentions raised by the plaintiff in his motion.

### I.

 First, the plaintiff insists that the hearing before the Holtzclaw Committee cannot be considered within the requirements of procedural due process because the Board of Regents had not made a "charge" that Dr. Rozman had failed to vacate the Military and Naval Science Building after being directed to do so, alleging that the Board of Regents relied upon that failure to vacate in

deciding against reemployment. Thus, it is argued, Dr. Rozman had no opportunity to respond to the "charge."

The "Statement of Areas of Concern Relating to Reappointment of Dr. Stephen L. Rozman" is the document presented to the Holtzclaw Committee by the Board of Regents. In it two references are made to failure to vacate the building after being directed to do so. At page 9 appears:

"It is reported that after the reading of the demand that the students vacate the Military and Naval Science Building, the group remaining feared arrest and sat in a circle with arms linked. It is not indicated whether Professor Rozman was in the group at that time."

At page 10 is this:

"Subsequently, Dr. Rozman is reported to have demanded a public apology from Dr. Ross for 'lies contained in the affidavit.' A copy of the letter directed to Dr. Ross by Dr. Rozman is attached as Exhibit 'C' and copy of Dr. Ross's [sic] reply is attached as Exhibit 'D'. Questions may be involved as to whether Dr. Rozman was objective in his reaction to the affidavit, whether he was careful to ascertain the true facts before charging Dr. Ross with having lied under oath and whether Dr. Rozman used the affidavit as a means of arousing emotions and inflaming students against the University administration."

The affidavit of Dr. Ross stated, in this connection:

"1. On May 4, 1970, . . . a large number of individuals, including . . . Stephen Rozman . . . occupied a building . . . known as the Military and Naval Science Building . . .

\* \* \* \* \* \*

"6. On May 5, 1970 at approximately 8:30 a. m. your petitioner demanded that said individuals, and each of them, vacate said building and cease and desist from their activities which threaten and intimidate other students and faculty members, and which preclude the normal use of said building. Said demand has been refused, . . . Said individuals refuse to honor said request and demand and are still occupying said building . . ."

The letter referred to as Exhibit C from Dr. Rozman to Dr. Ross was dated May 6, 1970, and in that letter Dr. Rozman, answering directly to the portions of the affidavit quoted herein, stated:

"I respond to this charge by . . . denying that I engaged in any activity which threatened or intimidated any students or faculty members. I call for the retraction of this accusation together with a public apology to each of us named in this statement."

Thus, a subject of inquiry regarding Dr. Rozman's remaining in the building after being directed to vacate was clearly presented to the Holtzclaw Committee, although the presentation was less assertive, perhaps, than some of the other subjects for inquiry. Most of the "areas of concern" were phrased in nonaccusatory language and this particular one was hardly unique. It, as with the others, did call to the committee's attention, as well as to Dr. Rozman's attention, a subject properly to be explored.

The Holtzclaw Committee did not wholly ignore the subject. In its report it found:

"From about 4:00 a. m. to the demand by President Soshnik about 6:30 a. m. that the demonstrators leave the M & N Building, the mood seems to have been one of relief that they had not been declared disruptive, fatigue and quiet resolve to continue the occupation until a special meeting of the University community scheduled for noon that day. . . .

"After the demand to vacate the building was read and the announcement made that the students who did not leave would be suspended, there was a feeling of betrayal and a resolve to resist arrest by sitting with linked arms. The mood was sad, disillusioned, and somewhat fearful of what

would happen when the police arrived to make arrests. (page 8)

\* \* \* \* \* \*

"Dr. Rozman did continue in the building during the night. However, the Administration position concerning the evacuation of the building seemed to waiver, and many witnesses, while presumably aware that the Administration would prefer their leaving, did not feel that their leaving had been demanded until about 6:00 a. m.; and some felt that they or a token force had at one time been given permission to remain in the building.

\* \* \* \* \* \*

"Until the announcement at about 6:00 a. m., those in the building felt that they had permission to be there and thought that they had the following understanding with the administration: That the presence of a token group of demonstrators in the pit of the M & N Building would not be construed as disruptive so long as the group remained quiet and peaceful.

"Dr. Rozman admits to being present at 8:30 a. m. . . . " (page 23)

Dr. Rozman testified before the Holtzclaw Committee twice and at his second appearance he testified about his continuing to remain in the building after a demand was made to leave. He testified:

"There were a lot of rumors, many students felt the reason Soshnik, Ross and Magrath betrayed their original position that we could remain all night was that they had received outside pressure. A number of students were rather indignant about it, as a matter of fact, after they suddenly changed their line early in the morning and said we have to leave, after they had given, said that we could remain indefinitely as long as we weren't disruptive, once they, once that line changed we talked among ourselves, 'Well, why did they all of a sudden decide to change their mind, and why did they call us disruptive at a time when our number had dwindled considerably and when most of us were sleeping? Why did they awaken us and tell us we were disruptive, which is in effect what happened.

"I mean, I was awakened to be told I was disruptive, and I didn't, I figured maybe I was having noisy dreams. And so we wondered why, we, we didn't question the—most of the talk including my own impressions did not relate to their lack of good faith, but we felt they were receiving considerable pressure from the outside, and some students indicated to me that they thought that they were actually supporting Soshnik, and really supporting his position against outside pressure by not leaving. That they felt that he was being pressured into something that he didn't that he himself didn't favor, that he was doing what he was doing very reluctantly." (Plaintiff's exhibit 55, Volume V, pages 631–632.)

At the trial in this court Dr. Rozman testified to the same effect and in more detail. He admitted freely that he remained in the Military and Naval Science Building after the reading by President Soshnik of defendants' exhibits 70 and 71, which directed those in the building to vacate it, and that he remained thereafter in the building from then until a few minutes before 10:00 a. m. Testimony varied as to what time defendants' exhibits 70 and 71 were read to the group, but it probably was about 8:30 a. m., although the Holtzclaw Committee's report, as indicated from the quotations shown above, placed it in terms of 6:00 or 6:30 a. m. At the trial Dr. Rozman testified that after the notices, defendants' exhibits 70 and 71, were read to the group, he sat in a circle with others in the building and interlocked arms with them for a minute or two as a gesture of solidarity and a mutual understanding of betrayal. He also testified that he had thought that the notices to evacuate, defendants' exhibits 70 and 71, were not directed to him. The evidence is clear, however, that such notices were read verbatim to the group and neither could be interpreted reasonably to be directed only at the students or be so interpreted

as to exclude Dr. Rozman. Indeed, one, defendants' exhibit 70, is labeled, "NOTICE" and begins:

"It is requested that you promptly vacate the Military and Naval Science Building . . ."

and in no sense limits itself to students or excludes any person. The other, defendants' exhibit 71, is labeled "STATEMENT TO BE DISTRIBUTED AND READ TO STUDENTS AND OTHERS . . . ." and begins:

"1. It is the conclusion of the appropriate University officials that your continued presence and occupation of these premises at this time constitutes disruptive or potentially disruptive conduct, which now interferes or will interfere with the University's work or with the rights of students . . .

"2. You are hereby advised that you are allowed a period of 15 minutes to accomplish an orderly evacuation of the premises now occupied by you, and to arrange for a more appropriate meeting time and place to discuss any issue or issues regarding the University which you care to discuss.

"3. You will be advised when the 15-minute period has expired and it is expected that you will then have left or promptly leave the premises."

Paragraph No. 4 states that there will be penalties for those who remain on the premises and limits itself in part to students by stating, "These penalties may include arrest and prosecution for any violations of laws and *insofar as students are concerned,* may also include . . . " (Emphasis added)

Neither notice reasonably could be interpreted as not being directed at Dr. Rozman, nor did he offer any explanation at the trial as to why he thought he was excluded from them.

I conclude, therefore, that the issue of Dr. Rozman's remaining in the building after being directed to vacate the building was before the Holtzclaw Committee and that Dr. Rozman not only was given an opportunity to testify about the issue but in fact did testify about it. Further-

more, it cannot be doubted that he testified about the issue at the trial in this court and his testimony fully sustains the conclusion of the Board of Regents, which was contained in its resolution recommending nonrenewal of the contract, as follows:

"G. On the morning of May 5th, while Dr. Rozman was in the Military and Naval Science Building, he was advised that the University then considered the continued occupation of the building by him and the students to be disruptive and he and the others were directed to vacate the building. He failed to do so and continued to remain with the students and continued to refuse to vacate the building. Dr. Rozman was present in the Military and Naval Science Building during the period from 6:30 a. m. to 8:30 a. m., May 5, 1970, during which all the students and Dr. Rozman had been directed to vacate the building and had been advised that the administration considered the demonstration had reached the point where it was disrupting normal University activities. The committee reports at that time:

'There was a feeling of betrayal and a resolve to resist arrest by sitting with linked arms. The mood was sad, disillusioned, and somewhat fearful of what would happen when the police arrived to make arrests.'

"Even under these circumstances, Dr. Rozman did not suggest the possibility of leaving the premises to any of the students nor did he leave."

It cannot be supposed that, had the issue of Dr. Rozman's failure to vacate the building, after being notified to do so, been pursued more vigorously by the Holtzclaw Committee or had the "charge" been more pointedly and positively made, the testimony of Dr. Rozman before that committee would have been contrary to his testimony before this court. The issue of his failure to vacate was squarely before this court by the plaintiff's claim in his complaint that "the resolution [of the Board of Regents] against the plaintiff falsely states as a ground

·for his termination that he refused to leave the building when directed to do so by the administration." If he had testified before the Holtzclaw Committee precisely as he testified in the trial here, there could have been no different conclusion about the issue from that set out in paragraph G of the Board of Regents' resolution. To say under those circumstances that due process was not followed would be to elevate form above substance. The purpose of procedural due process is to discover the truth, it being supposed that following specific procedures is more likely to unfold truth than not following them. But Dr. Rozman is in no position to complain that those procedures were not followed, if they were not because he has demonstrated in this court that the truth to which those procedures would have led is the same as that found by the Board. What the procedures would have led to is a finding that Dr. Rozman failed to vacate the building after he was directed by the administration to do so, which is precisely the conclusion the Board reached.

## II.

 Second, the plaintiff urges that some of the factors recited in the resolution of the Board of Regents as having been taken into consideration in the determination for nonrenewal were clearly within Dr. Rozman's constitutionally protected rights, and therefore the Board of Regents could not lawfully rely upon such factors. The ones claimed to be clearly protected were not identified. A review of all the factors shows that they are interrelated, and collectively they constitute a summary of Dr. Rozman's participation in the occupancy of the Military and Naval Science Building. The burden in this case is upon the plaintiff to show that there has been a denial of his constitutionally protected rights. In my view he has failed to carry that burden, and I cannot extract from the various factors contained in the Board of Regents' resolution a particular sentence, statement, or paragraph which so patently constitutes a protected constitutional

right that the inclusion of it in the list of factors considered can be said to taint the entire decision not to renew the contract.

Additionally, I note that there really is no testimony of what individual factors actually were determinative for the Board of Regents. The list of factors in the resolution were matters relied upon by the members, but which particular factors were crucial was not established by any evidence. Only one member of the Board of Regents, John G. Elliott, testified at the trial. From his testimony it appears that he considered that Dr. Rozman's failure to leave the Military and Naval Science Building after the group's presence had been declared disruptive by Dr. Soshnik was of some significance, although even from his testimony it cannot be said that that factor was pivitol in his thinking or in any other member's thinking.

The motion requesting judgment for the plaintiff or in the alternative a new trial will be denied.